# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

CASE NO:

CARA JENNINGS, ERIN ADAMS, CATHY
AGUILERA, DAVID ANDERSON, TRISTAN
ANDERSON, KELLY BENJAMIN, YAN
BERGER, NOAM BROWN, JULIA DANIEL,
ROBERT "BO" DAVIS, MATTHEW DAVIS,
JAVIER DEL SOL, CODY DORNBUSCH,
ABIGAIL FLETCHER, CODY GALLIGAN,
POOJA GEHI, JEREMIAH GILDEA,
JONATHAN GOLDBERG, JASON HICKS,
AMANDA JENNINGS, MARY ALISON
LAKE, BEN MADDOX, MELODY MALFA,
CHARLES ARNOLD MALLOY IV, DAWN
MATLEK, SARAH MCDANIEL,
NATHANIAL MILLER, CHRISTIAN J.
MINAYA, STELIA NAPPI, NATALIE
POLTORATZKY, DANIEL ROBLETO,
VERONICA ROBLETO, JOSHUA
SAMPTER, PETER SCHULTZ, DEBORAH
SMITH, SUE STEVENS, PANAGIOTI
"PETER" TSOLKAS,

**07-23008**

**CIV-COOKE**

**MAGISTRATE JUDGE
BROWN**

2007 NOV 19 PM 3: 25

CLARENCE
CLERK U.S. DIST. CT.
S.D. OF FL - MIAMI

Plaintiffs,

v.

CITY OF MIAMI, a municipal entity; CITY
OF MIAMI BEACH, a municipal entity;
CITY OF FORT LAUDERDALE, a municipal
entity; BROWARD SHERIFF AL
LAMBERTI, in his official capacity as Sheriff
of Broward County; Miami Police Dept. Chief
JOHN TIMONEY, in his individual capacity;
Miami Police Dept. Deputy Chief FRANK
FERNANDEZ, in his individual capacity;
Miami Police Dept. Major ADAM BURDEN,
in his individual capacity; Miami Police Dept.
Assistant Chief THOMAS CANNON, in his

**individual capacity;  Miami Beach Police Dept.
Lieutenant ED YERO, in his individual
capacity; Broward Sheriff's Office Captain
JOHN BROOKS, in his individual capacity;
Fort Lauderdale Police Dept. Captain LEE
SPECTOR, in his individual capacity,**

**Defendants.**

## COMPLAINT–CLASS ACTION

### INTRODUCTION

1.     This civil action arises from the intentional disruption of core political speech and other First Amendment-protected expressive activity, by law enforcement officials and police officers employed by the City of Miami and other South Florida governmental entities.    This disruption was effected through the wrongful "herding" of unarmed, peaceful demonstrators,  and the systemic use of para-military tactics and offensive

*Jennings v. City of Miami*
Case No.

weapons, to deliberately terrorize peaceful demonstrators at the Free Trade Area of the Americas (hereinafter "FTAA") ministerial meetings in Miami, Florida, during November 2003.   The egregious violation of First Amendment rights, Fourth Amendment rights, and other civil liberties during the FTAA meetings constituted a *de facto* suspension of constitutional rights in Miami.   The unconstitutional acts by these defendants resulted in severe personal injuries and economic  losses to these plaintiffs and to many other persons.

## JURISDICTION AND VENUE

2.    This action seeks damages pursuant to 42 U.S.C. § 1983 for violation of the First and Fourth Amendment rights of plaintiffs.    This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343.

3.    Venue is proper in the Southern District of Florida pursuant to 28 U.S.C.  § 1391(b) as all defendants reside in this district and all of the acts and omissions giving rise to this action occurred in the Southern District of Florida.

4.    This court has supplemental jurisdiction over state law claims through the operation of 28 U.S.C. § 1367.  All conditions precedent to maintenance of state law claims have been performed in accordance with *Fla. Stat.* § 768.28.

## JURY TRIAL DEMAND

5.    Plaintiffs demand a jury trial in this action.

## THE PARTIES

*Jennings v. City of Miami*
Case No.
**Plaintiffs:**

6.     Plaintiff **CARA JENNINGS** is a City Commissioner of Lake Worth, Florida. During the morning and afternoon of November 20, 2003, Ms. Jennings participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Ms. Jennings was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street. The actions of the law enforcement officers were without reason, and Ms. Jennings suffered other egregious violations of her constitutional rights. Jennings is a class representative (see *infra* Class Action Allegations section).

7.     Plaintiff **ERIN ADAMS** is a caregiver who is a resident of the State of Minnesota. During the morning and afternoon of November 20, 2003, Ms. Adams participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Ms. Adams was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street. The actions of the law enforcement officers were without reason, and Ms. Adams suffered other egregious violations of her constitutional rights.

8.     Plaintiff **CATHY AGUILERA** is a labor organizer who is a resident of the State of Florida. During the morning and afternoon of November 20, 2003, Ms. Aguilera participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Ms. Aguilera was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement

4

*Jennings  v. City of Miami*
Case No.

officers while on or near  Biscayne Blvd. and/or NE Third Street, and/or other streets in the

vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement

officers were  without reason, and Ms. Aguilera suffered other egregious violations of her

constitutional rights.

9.     Plaintiff **DAVID ANDERSON** is an auto mechanic who is a resident of the State of

North Carolina.   During the morning and afternoon of November 20, 2003, Mr. Anderson

participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the

FTAA meetings.   During the late afternoon, Mr. Anderson, while on the lawn on the east

side of Biscayne Blvd.,  was shot without reason on multiple occasions by law enforcement

officers, while trying to assist a female activist[1] who had been shot by law enforcement

officers, and suffered other egregious violations of his constitutional rights.

10.    Plaintiff **TRISTAN ANDERSON** is a resident of the State of California.   During

the morning and afternoon of November 20, 2003, Mr. Anderson  participated in peaceful

activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.   During the

late afternoon, Mr. Anderson was sprayed with chemical agents and/or shot with less-lethal

projectiles  on multiple occasions by law enforcement officers while on or near  Biscayne

Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or

NE Third Street.   The actions of the law enforcement officers were  without reason, and

Mr. Anderson suffered other egregious violations of his constitutional rights.

11.    Plaintiff **KELLY BENJAMIN** is a community organizer who is a resident of the

State of Florida.   During the morning and afternoon of November 20, 2003, Mr. Benjamin

---

[1] The individual Mr. Anderson assisted was Nikki Hartman, who is currently a
plaintiff in <u>Rauen v. City of Miami</u>, Case No. 06-21182-CIV-ALTONAGA.

*Jennings v. City of Miami*
Case No.

participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the
FTAA meetings.  During the late afternoon, Mr.Benjamin was sprayed with chemical
agents and/or shot with less-lethal projectiles  on multiple occasions by law enforcement
officers while on or near  Biscayne Blvd. and/or NE Third Street, and/or other streets in the
vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement
officers were  without reason, and Mr. Benjamin suffered other egregious violations of his
constitutional rights.

12.     Plaintiff **YAN BERGER** is an artist who is a resident of North Carolina.   During
the morning and afternoon of November 20, 2003, Mr. Berger  participated in peaceful
activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.   During the
late afternoon, Mr. Berger  was sprayed with chemical agents and/or shot with less-lethal
projectiles  on multiple occasions by law enforcement officers while on or near  Biscayne
Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or
NE Third Street.   The actions of the law enforcement officers were  without reason, and
Mr. Berger suffered other egregious violations of his constitutional rights.

13.     Plaintiff **NOAM BROWN** is a teacher who is a resident of the State of Florida.
During the morning and afternoon of November 20, 2003, Mr. Brown  participated in
peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.
During the late afternoon, Mr. Brown was sprayed with chemical agents and/or shot with
less-lethal projectiles  on multiple occasions by law enforcement officers while on or near
Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne
Blvd. and/or NE Third Street.   The actions of the law enforcement officers were  without
reason, and Mr. Brown suffered other egregious violations of his constitutional rights.

6

*Jennings v. City of Miami*
Case No.

14.    Plaintiff **JULIA DANIEL** is a community organizer who is a resident of the State of Florida.  During the morning and afternoon of November 20, 2003, Ms. Daniel participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.  During the late afternoon, Ms. Daniel was sprayed with chemical agents and/or shot with less-lethal projectiles  on multiple occasions by law enforcement officers while on or near  Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement officers were  without reason, and Ms. Daniel suffered other egregious violations of her constitutional rights.

15.    Plaintiff  **ROBERT ("BO") DAVIS** is a resident of the State of North Carolina. During the morning and afternoon of November 20, 2003, Mr. Davis  participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Mr. Davis was sprayed with chemical agents and/or shot with less-lethal projectiles  on multiple occasions by law enforcement officers while on Biscayne Blvd. and/or  the lawn on the east side of Biscayne Blvd.   The actions of the law enforcement officers were  without reason, and Mr. Davis suffered other egregious violations of his constitutional rights.

16.    Plaintiff **MATTHEW DAVIS** is a resident of the State of North Carolina, and is the brother of Plaintiff **ROBERT ("BO") DAVIS**.   During the morning and afternoon of November 20, 2003, Mr. Davis  participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.  During the late afternoon, Mr. Davis was sprayed with chemical agents and/or shot with less-lethal projectiles  on multiple occasions by law enforcement officers while on Biscayne Blvd. and/or  the lawn on the east side of Biscayne Blvd.   The actions of the law enforcement officers were  without reason, and Mr. Davis suffered other egregious violations of his constitutional rights.

*Jennings  v. City of Miami*
Case No.

17.    Plaintiff **JAVIER DEL SOL** is a student who is a resident of the State of Florida. During the morning and afternoon of November 20, 2003, Mr. Del Sol  participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Mr. Del Sol was sprayed with chemical agents and/or shot with less-lethal projectiles  on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement officers were  without reason, and Mr. Del Sol suffered other egregious violations of his constitutional rights.

18.    Plaintiff **CODY DORNBUSCH** is a farm laborer who is a resident of the State of New York.  During the morning and afternoon of November 20, 2003, Mr. Dornbusch participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.   During the late afternoon, Mr. Dornbusch was sprayed with chemical agents and/or shot with less-lethal projectiles  on multiple occasions by law enforcement officers while on or near  Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement officers were  without reason, and Mr. Dornbusch suffered other egregious violations of his constitutional rights.

19.    Plaintiff **ABIGAIL FLETCHER** is a student who is a resident of the State of Florida.  During the morning and afternoon of November 20, 2003, Ms. Fletcher participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.   During the late afternoon, Ms. Fletcher  was sprayed with chemical agents and/or shot with less-lethal projectiles  on multiple occasions by law enforcement officers while on or near  Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement

*Jennings  v. City of Miami*
Case No.

officers were  without reason, and Ms. Fletcher suffered other egregious violations of her

constitutional rights.

20.    Plaintiff **CODY GALLIGAN** is a resident of the State of Florida.   During the

morning and afternoon of November 20, 2003, Mr. Galligan  participated in peaceful

activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.   During the

late afternoon, Mr. Galligan was sprayed with chemical agents and/or shot with less-lethal

projectiles  on multiple occasions by law enforcement officers while on or near  Biscayne

Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or

NE Third Street.   The actions of the law enforcement officers were  without reason, and

Mr. Galligan suffered other egregious violations of his constitutional rights.    Galligan is a

class representative.

21.    Plaintiff **POOJA GEHI** is an attorney who is a resident of the State of New York.

During the morning and afternoon of November 20, 2003, Ms. Gehi  participated in

peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.

During the late afternoon, Ms. Gehi was sprayed with chemical agents and/or shot with

less-lethal projectiles  on multiple occasions by law enforcement officers while on or near

Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne

Blvd. and/or NE Third Street.   The actions of the law enforcement officers were  without

reason, and Ms. Gehi  suffered other egregious violations of her constitutional rights.

22.    Plaintiff **JEREMIAH GILDEA** is a bicycle mechanic who is a resident of the State

of Florida.   During the morning and afternoon of November 20, 2003, Mr. Gildea

participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the

FTAA meetings.   During the late afternoon, Mr. Gildea was sprayed with chemical agents

and/or shot with less-lethal projectiles  on multiple occasions by law enforcement officers

*Jennings v. City of Miami*
Case No.

while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street. The actions of the law enforcement officers were without reason, and Mr. Gildea suffered other egregious violations of his constitutional rights.

23.    Plaintiff **JONATHAN GOLDBERG** is a computer systems administrator who is a resident of the State of New York. During the morning and afternoon of November 20, 2003, Mr. Goldberg participated as a medic in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Mr. Goldberg was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street. The actions of the law enforcement officers were without reason, and Mr. Goldberg suffered other egregious violations of his constitutional rights.

24.    Plaintiff **JASON HICKS** is an artist who is a resident of the State of Vermont. During the morning and afternoon of November 20, 2003, Mr. Hicks participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Mr. Hicks was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street. The actions of the law enforcement officers were without reason, and Mr. Hicks suffered other egregious violations of his constitutional rights.

25.    Plaintiff **AMANDA JENNINGS** is a researcher who is a resident of the State of New York, and she is the sister of Plaintiff **CARA JENNINGS**. During the morning and afternoon of November 20, 2003, Ms. Jennings participated in peaceful activities on or

10

*Jennings v. City of Miami*
Case No.

near Biscayne Blvd. in Miami, relating to the FTAA meetings.   During the late afternoon, Ms. Jennings was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement officers were without reason, and Ms. Jennings suffered other egregious violations of her constitutional rights.

26.    Plaintiff **MARY ALISON LAKE** is a waitress who is a resident of the State of Florida.  During the morning and afternoon of November 20, 2003, Ms. Lake participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Ms. Lake was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement officers were without reason, and Ms. Lake suffered other egregious violations of her constitutional rights.

27.    Plaintiff **BEN MADDOX** is a waiter who is a resident of the State of California. During the morning and afternoon of November 20, 2003, Mr. Maddox participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Mr. Maddox was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement officers were without reason, and Mr. Maddox suffered other egregious violations of his constitutional rights.

28.    Plaintiff **MELODY MALFA** is a senior caregiver who is a resident of the State of Florida.  During the morning and afternoon of November 20, 2003, Ms. Malfa participated

*Jennings v. City of Miami*
Case No.

in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Ms. Malfa was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street. The actions of the law enforcement officers were without reason, and Ms. Malfa suffered other egregious violations of her constitutional rights.

29.    Plaintiff **CHARLES ARNOLD MALLOY, IV,** is a teacher who is a resident of Pennsylvania. During the morning and afternoon of November 20, 2003, Mr. Malloy participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Mr. Malloy was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street. The actions of the law enforcement officers were without reason, and Mr. Malloy suffered other egregious violations of his constitutional rights.

30.    Plaintiff **DAWN MATLEK** is a food service worker who is a resident of the State of Florida. During the morning and afternoon of November 20, 2003, Ms. Matlek participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Ms. Matlek was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street. The actions of the law enforcement officers were without reason, and Ms. Matlek suffered other egregious violations of her constitutional rights.

31.    Plaintiff **SARAH MCDANIEL** is an assistant art instructor who is a resident of the

12

*Jennings v. City of Miami*
Case No.

State of Pennsylvania.  During the morning and afternoon of November 20, 2003, Ms. McDaniel  participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.  During the late afternoon, Ms. McDaniel was sprayed with chemical agents and/or shot with less-lethal projectiles  on multiple occasions by law enforcement officers while on or near  Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.  The actions of the law enforcement officers were  without reason, and Ms. McDaniel suffered other egregious violations of her constitutional rights.

32.     Plaintiff **NATHANIAL MILLER** is a resident of the State of Pennsylvania. During the morning and afternoon of November 20, 2003, Mr. Miller  participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Mr. Miller was sprayed with chemical agents and/or shot with less-lethal projectiles  on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.  The actions of the law enforcement officers were  without reason, and Mr. Miller suffered other egregious violations of his constitutional rights.

33.     Plaintiff **CHRISTIAN J. MINAYA** is a resident of the State of Florida.  During the morning and afternoon of November 20, 2003, Mr. Minaya  participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.  During the late afternoon, Mr. Minaya was sprayed with chemical agents and/or shot with less-lethal projectiles  on multiple occasions by law enforcement officers while on or near  Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.  The actions of the law enforcement officers were  without reason, and Mr. Minaya suffered other egregious violations of his constitutional rights.

34.     Plaintiff **STELIA NAPPI** is a waitress who is a resident of the State of

*Jennings v. City of Miami*
Case No.

Pennsylvania. During the morning and afternoon of November 20, 2003, Ms. Nappi participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Ms. Nappi was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street. The actions of the law enforcement officers were without reason, and Ms. Nappi suffered other egregious violations of her constitutional rights.

35.     Plaintiff **NATALIE POLTORATZKY** is a resident of the State of Florida. During the morning and afternoon of November 20, 2003, Ms. Poltoratzky participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Ms. Poltoratzky was choked with a baton by a law enforcement officer, and hit with a bottle containing chemical agents by another law enforcement officer, while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street. The actions of the law enforcement officers were without reason, and Ms. Poltoratzky suffered other egregious violations of her constitutional rights.

36.     Plaintiff **DANIEL ROBLETO** is a resident of the State of Florida.  During the morning and afternoon of November 20, 2003, Mr. Robleto participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.  During the late afternoon, Mr. Robleto was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street. The actions of the law enforcement officers were without reason, and Mr. Robleto suffered other egregious violations of his constitutional rights.

*Jennings v. City of Miami*
Case No.

37.     Plaintiff **VERONICA ROBLETO** is a resident of the State of Florida, and is the sister of Plaintiff **DANIEL ROBLETO**.  During the morning and afternoon of November 20, 2003, Ms. Robleto  participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.   During the late afternoon, Ms. Robleto was sprayed with chemical agents and/or shot with less-lethal projectiles  on multiple occasions by law enforcement officers while on or near  Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement officers were  without reason, and Ms. Robleto suffered other egregious violations of her constitutional rights.

38.     Plaintiff **JOSHUA SAMPTER** is a model who is a resident of the State of Florida. During the morning and afternoon of November 20, 2003, Mr. Sampter  participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Mr. Sampter was sprayed with chemical agents and/or shot with less-lethal projectiles  on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement officers were  without reason, and Mr. Sampter suffered other egregious violations of his constitutional rights.

39.     Plaintiff  **PETER SCHULTZ** is a resident of the State of Florida.   During the morning and afternoon of November 20, 2003, Mr. Schultz attended peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings, as a National Lawyers Guild (NLG) Legal Observer (LO), and wore a bright green baseball cap provided by the NLG clearly identifying him as a LO.   During the late afternoon, Mr. Schultz was sprayed with chemical agents and/or shot with less-lethal projectiles  on multiple occasions by law enforcement officers while on or near  Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement officers were  without reason, and Mr. Schultz suffered other egregious

15

*Jennings v. City of Miami*
Case No.

violations of his constitutional rights.

40.    Plaintiff **DEBORAH SMITH** is a resident of the State of Florida.   During the morning and afternoon of November 20, 2003, Ms. Smith attended peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings, as a National Lawyers Guild (NLG) Legal Observer (LO), and wore a bright green baseball cap provided by the NLG clearly identifying her as a LO.   During the late afternoon, Ms. Smith was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near  Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement officers were  without reason, and Ms. Smith suffered other egregious violations of her constitutional rights.

41.    Plaintiff **SUE STEVENS** is a student who is a resident of the State of Florida. During the morning and afternoon of November 20, 2003, Ms. Stevens  participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings. During the late afternoon, Ms. Stevens was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near Biscayne Blvd. and/or NE Third Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement officers were  without reason, and Ms. Stevens suffered other egregious violations of her constitutional rights.

42.    Plaintiff **PANAGIOTI "PETER" TSOLKAS** is the chair of a local environmental group who is a resident of the State of Florida.   During the morning and afternoon of November 20, 2003, Mr. Tsolkas  participated in peaceful activities on or near Biscayne Blvd. in Miami, relating to the FTAA meetings.   During the late afternoon, Mr. Tsolkas was sprayed with chemical agents and/or shot with less-lethal projectiles on multiple occasions by law enforcement officers while on or near  Biscayne Blvd. and/or NE Third

16

*Jennings v. City of Miami*
Case No.

Street, and/or other streets in the vicinity of Biscayne Blvd. and/or NE Third Street.   The actions of the law enforcement officers were without reason, and Mr. Tsolkas suffered other egregious violations of his constitutional rights.   Tsolkas is a class representative.

**Defendants:**

43.   Defendant **CITY OF MIAMI (hereinafter "Miami")** is an entity corporate and politic, duly organized under the laws of the State of Florida.   The City of Miami enacted the municipal ordinances pursuant to which plaintiffs and others were deprived of their rights under the First Amendment to speak, assemble and petition.   The City of Miami is the governmental entity responsible, as a matter of law, for the actions of the **Miami Police Department (hereinafter "Miami PD" or "MPD")**, its officials, agents and employees, insofar as the **MPD** is an administrative subdivision of the City of Miami. Through the **MPD** and its other administrative departments, the City of Miami coordinated the activities of those federal, state and local law enforcement and prosecutorial agencies which engaged in FTAA-related actions from the summer of 2003 through late November 2003.   Through the City of Miami's primary participation in the command structure of FTAA-related activity, including the Miami Police Dept. Steering Committee and the Joint Law Enforcement Command, Miami Police Chief John Timoney, the city's policymaker for police matters, designed, ratified and/or condoned the plan to limit core political speech in Miami in November 2003.   The city implemented its policy to limit core political speech through the assault by its police officers on unarmed citizens on November 20, 2003.

44.   Defendant **CITY OF MIAMI BEACH (hereinafter "Miami Beach")** is an entity corporate and politic, duly organized under the laws of the State of Florida.   Miami Beach is the governmental entity responsible, as a matter of law, for the actions of the **Miami Beach Police Department (hereinafter "Miami Beach PD" or "MBPD")**, its officials, agents and employees, insofar as the **Miami Beach PD** is an administrative subdivision of

17

*Jennings v. City of Miami*
Case No.

the City of Miami Beach.  The City of Miami Beach executed a "Mutual Aid Agreement" with the City of Miami before the FTAA-related events of 2003.  Through the Miami Beach PD's participation in the FTAA-related Joint Law Enforcement Command, the city's policymaker for police matters designed, ratified and/or condoned the plan to use paramilitary-style forces to limit core political speech in Miami at the FTAA Ministerial Meetings.  To assist in the implementation of this policy, Miami Beach provided police field forces (including a paramilitary-style SWAT force), supervisory personnel, and equipment, all of which were used  in the deprivation  of the First and Fourth Amendment rights of the plaintiffs during the afternoon of November 20, 2003, near Biscayne Blvd. in Miami.

45.     Defendant **CITY OF FORT LAUDERDALE (hereinafter "Ft. Lauderdale")** is an entity corporate and politic, duly organized under the laws of the State of Florida.  Ft. Lauderdale is the governmental entity responsible, as a matter of law,  for the actions of the **Ft. Lauderdale Police Department (hereinafter "Ft. Lauderdale PD" or "FTLPD")**, its officials, agents and employees, insofar as the **Ft. Lauderdale PD** is an administrative subdivision of the City of Fort Lauderdale.  Ft. Lauderdale executed a "Mutual Aid Agreement" with the City of Miami before the FTAA-related events of 2003.   Through the **Ft. Lauderdale PD's** participation in the FTAA-related Joint Law Enforcement Command, the city's policymaker for police matters designed, ratified and/or condoned the plan to use paramilitary-style forces to limit core political speech in Miami at the FTAA Ministerial Meetings.  To assist in the implementation of this policy, Ft. Lauderdale provided police field forces (including a paramilitary-style SWAT force known as the BRAVO team), supervisory personnel, and equipment, all of which were used in the deprivation  of the First and Fourth Amendment rights of the plaintiffs during the afternoon of November 20, 2003, near Biscayne Blvd. in Miami.

46.     Defendant **AL LAMBERTI (hereinafter "Lamberti")** is the Sheriff of Broward

*Jennings v. City of Miami*
Case No.

County, and, in being sued in his official capacity as the Sheriff of Broward County, is synonymous with the **Broward Sheriff's Office (hereinafter "BSO")**, a county-level law enforcement agency, duly organized under the laws of the State of Florida. Defendant **LAMBERTI** in his official capacity is responsible, as a matter of law, for the actions of the BSO, its officials, agents and employees. **BSO** executed a "Mutual Aid Agreement" with the City of Miami before the FTAA-related events of 2003. Through **BSO's** participation in the FTAA-related Joint Law Enforcement Command, **BSO** designed, ratified and/or condoned the plan to use paramilitary-style forces to limit core political speech in Miami at the FTAA Ministerial Meetings. To assist in the implementation of this policy, **BSO** provided police field forces (including a paramilitary-style SWAT force), supervisory personnel, and equipment, all of which were used to in the deprivation of the First and Fourth Amendment rights of the plaintiffs during the afternoon of November 20, 2003, near Biscayne Blvd. in Miami.

47.     Defendant **JOHN TIMONEY** (hereinafter "Timoney" or "Chief Timoney") is, and at all times relevant to this action was, the Chief of Police of Miami Police Department He is responsible for the policies, practices and customs of the **MPD**, including all policies, practices and customs challenged herein as unlawfully applied to the activities of lawful demonstrators in Miami opposing the policies of the FTAA in November 2003. **TIMONEY** has final policy-making authority for the **MPD**, including policies for arrests, use of force and training of officers. At all times relevant to this action, defendant **TIMONEY** was an employee of the defendant **CITY** and acting within the scope and course of his employment, and, in all of the acts specifically set forth herein, this defendant was acting under color of state law. **TIMONEY** was present on Biscayne Blvd. in the late afternoon, at the precise time when plaintiffs were shot by weapons wielded by officers acting under **TIMONEY's** overall command. In the After-Action Report issued by the **MPD**, defendant **TIMONEY** acknowledges planning the law enforcement actions complained of herein. **TIMONEY** targeted plaintiffs and others based on their political

19

*Jennings  v. City of Miami*
Case No.

ideology and/or their association with other demonstrators.  **TIMONEY** also authorized,

ratified and condoned the unlawful conduct of other officers as challenged herein.

**TIMONEY** is sued in his  individual capacity for compensatory and punitive damages.

48.     Defendant **FRANK FERNANDEZ** (hereinafter "Fernandez" or "Deputy Chief

Fernandez") is, and at all times relevant to this action was,  the Deputy Chief of Police of

the **MPD**.  Deputy Chief **FERNANDEZ** has acknowledged under oath that he was the

**MPD** official responsible for the decision to march a closely arranged line of police

officers northbound from the FTAA Security Fence on Biscayne Blvd. in Miami at

approximately 3:30 to 4:00 PM on November 20, 2003, which line then engaged in brutal

violence.  Deputy Chief **FERNANDEZ** is personally responsible for illegal practices

engaged in by police officers that disrupted legal First Amendment activities of peaceful

demonstrators  opposing the policies of the FTAA on November 20, 2003.    At all times

relevant to this action, defendant **FERNANDEZ** was an employee of the defendant **CITY**

**OF MIAMI** and acting within the scope and course of his employment, and, in all of the

acts specifically set forth herein, this defendant was acting under color of state law.

**FERNANDEZ** was present on Biscayne Blvd. in the late afternoon, at the precise time

when plaintiffs were shot by weapons wielded by officers acting under the command of

**FERNANDEZ** and other supervisory officials.  Defendant **FERNANDEZ** participated

fully in planning the law enforcement actions complained of herein, specifically by

targeting plaintiffs and others based on their political ideology and/or their association with

other demonstrators.  **FERNANDEZ** also authorized, ratified and condoned the unlawful

conduct of other police officers on November 20, 2003, including through his failure to

intercede when he personally observed law enforcement officers (hereinafter "LEOs")

shooting unarmed, peaceful demonstrators with a variety of weaponry.  **FERNANDEZ** is

sued in his individual capacity for compensatory and punitive damages.

49.     Defendant **ADAM BURDEN** (hereinafter "Burden" or "Major Burden") is, and at

*Jennings v. City of Miami*
Case No.

all times relevant to this action was, a Major in the **MPD**. Major **BURDEN** has been identified on video as being present with other **MPD** police officials behind a closely arranged line of police officers on Biscayne Blvd. in Miami at approximately 4:00 PM on November 20, 2003, which police line then engaged in brutal violence. Major **BURDEN** is personally responsible for illegal practices engaged in by police officers that disrupted legal First Amendment activities of peaceful demonstrators on November 20, 2003, and for his failure to intercede to stop either gratuitous police violence or the egregious deprivation of First Amendment and Fourth Amendment rights. At all times relevant to this action, defendant **BURDEN** was an employee of the defendant **CITY OF MIAMI** and acting within the scope and course of his employment, and, in all of the acts specifically set forth herein, this defendant was acting under color of state law. **BURDEN** was present on Biscayne Blvd. in the late afternoon, at the precise time when plaintiffs were shot by weapons wielded by officers acting under the command of **BURDEN** and other **MPD** supervisory officials. Defendant **BURDEN** participated fully in planning the law enforcement actions complained of herein, specifically by targeting plaintiffs and others based on their political ideology and/or their association with other demonstrators. **BURDEN** also authorized, ratified and condoned the unlawful conduct of other police officers on November 20, 2003, including through his failure to intercede when he personally observed LEOs shooting unarmed, peaceful demonstrators with a variety of weaponry. **BURDEN** is sued in his individual capacity for compensatory and punitive damages.

50.     Defendant **THOMAS CANNON** (hereinafter "Cannon" or "Captain Cannon") is presently an Assistant Chief with the **MPD**, although in November 2003 he held the rank of Captain in the same police department. **CANNON** has acknowledged under oath that he was the **MPD** official responsible for the decision to have a closely-arranged line of police officers on Biscayne Blvd. in Miami, at approximately 4:00 PM on November 20, 2003, begin discharging weapons at a group of unarmed demonstrators. **CANNON** is

*Jennings v. City of Miami*
Case No.

personally responsible for illegal practices engaged in by police officers that disrupted

legal First Amendment activities of peaceful demonstrators  opposing the policies of the

FTAA on November 20, 2003.   At all times relevant to this action, defendant **CANNON**

was an employee of the defendant **CITY OF MIAMI** and acting within the scope and

course of his employment,   and in all of the acts specifically set forth herein this defendant

was acting under color of state law.  **CANNON** was present on Biscayne Blvd. in the late

afternoon, at the precise time when plaintiffs were shot by weapons wielded by officers

acting under the command of **CANNON** and other **MPD** supervisory officials.  Defendant

**CANNON** participated fully in planning the law enforcement actions complained of

herein, specifically by targeting plaintiffs and others based on their political ideology

and/or their association with other demonstrators.  **CANNON** also authorized, ratified and

condoned the unlawful conduct of other police officers on November 20, 2003, including

through his failure to intercede when he personally observed law enforcement officers

(hereinafter "LEOs") shooting unarmed, peaceful demonstrators with a variety of

weaponry.  **CANNON** is sued in his individual capacity for compensatory and punitive

damages.


51.  Defendant **ED YERO** (hereinafter "Yero" or "Lt. Yero") at all times relevant to this

action was a Lieutenant in the **Miami Beach PD**.  Defendant **YERO** has been identified as

a Field Commander acting in a supervisory capacity, in charge of a force of SWAT law

enforcement officers from the **Miami Beach PD** on or adjacent to Biscayne Blvd. in

Miami at approximately 4:00 PM on November 20, 2003.   While in command of this

SWAT force, Lt. **YERO** authorized SWAT team members to discharge a variety of

weapons into the group of unarmed, peaceful demonstrators, even though there was no

individualized probable cause to believe that any person was engaged in criminal activity.

Accordingly, Lt. **YERO** is personally responsible for illegal practices engaged in by police

officers that disrupted legal First Amendment activities of peaceful demonstrators on

November 20, 2003, and for his failure to intercede to stop either gratuitous police violence

*Jennings v. City of Miami*
Case No.

or the egregious deprivation of First Amendment and Fourth Amendment rights.  Lt.
**YERO** targeted plaintiffs and others based on their political ideology and/or their
association with other demonstrators. At all times relevant to this action, defendant **YERO**
was an employee of the defendant **CITY OF MIAMI BEACH** and acting within the scope
and course of his employment  and in all of the acts specifically set forth herein this
defendant was acting under color of state law.  **YERO** was present on Biscayne Blvd. in
the late afternoon, at the precise time when  plaintiffs were shot by weapons discharged by
SWAT officers.  **YERO** is sued in his individual capacity for compensatory and punitive
damages.


52.  Defendant **JOHN BROOKS**  (hereinafter "Brooks" or "Capt. Brooks") at all times
relevant to this action was a Captain in the **BSO**.  Defendant **BROOKS** is currently the
Police Chief of the City of Sunrise, Broward County, Florida.  Defendant **BROOKS** has
been identified as a Field Commander acting in a supervisory capacity, in charge of a force
of SWAT LEOs and "field force" LEOs from the **BSO** on or adjacent to Biscayne Blvd. in
Miami at approximately 4:00 PM on November 20, 2003.   While in command of this
SWAT team and field force Capt. **BROOKS** authorized SWAT team members to
discharge a variety of weapons into the group of unarmed, peaceful demonstrators, even
though there was no individualized probable cause to believe that any person was engaged
in criminal activity.  Accordingly, Capt. **BROOKS** is personally responsible for illegal
practices engaged in by police officers that disrupted legal First Amendment activities of
peaceful demonstrators on November 20, 2003, and for his failure to intercede to stop
either gratuitous police violence or the egregious deprivation of First Amendment and
Fourth Amendment rights.   Capt. **BROOKS** targeted plaintiffs and others based on their
political ideology and/or their association with other demonstrators. At all times relevant to
this action, defendant **BROOKS** was an employee of the defendant **BSO** and acting within
the scope and course of his employment  and at all times relevant to this action, and in all
of the acts specifically set forth herein, this defendant was acting under color of state law.

23

*Jennings v. City of Miami*
Case No.

**BROOKS** was present on Biscayne Blvd. in the late afternoon, at the precise time when plaintiffs were shot by weapons discharged by SWAT officers.  **BROOKS** is sued in his individual capacity for compensatory and punitive damages.

53.   Defendant **LEE SPECTOR**  (hereinafter "Spector" or "Capt. Spector") at all times relevant to this action was a Captain in the **Ft. Lauderdale PD**.  Defendant **SPECTOR** has been identified as a Field Commander acting in a supervisory capacity, in charge of a force of SWAT law enforcement officers from the **Ft. Lauderdale PD's "BRAVO Team"** on or adjacent to Biscayne Blvd. in Miami at approximately 4:00 PM on November 20, 2003.   While in command of this SWAT force, Capt. **SPECTOR** authorized BRAVO SWAT team members to discharge a variety of weapons into the group of unarmed, peaceful demonstrators, even though there was no individualized probable cause to believe that any person was engaged in criminal activity.  Accordingly, Capt. **SPECTOR** is personally responsible for illegal practices engaged in by police officers that disrupted legal First Amendment activities of peaceful demonstrators on November 20, 2003, and for his failure to intercede to stop either gratuitous police violence or the egregious deprivation of First Amendment and Fourth Amendment rights.   Capt. **SPECTOR** targeted plaintiffs and others based on their political ideology and/or their association with other demonstrators. At all times relevant to this action, defendant **SPECTOR** was an employee of the defendant **Ft. Lauderdale PD** and acting within the scope and course of his employment  and  in all of the acts specifically set forth herein this defendant was acting under color of state law.  **SPECTOR** was present on Biscayne Blvd. in the late afternoon, at the precise time when  plaintiffs were shot by weapons discharged by SWAT officers. **SPECTOR** is sued in his individual capacity for compensatory and punitive damages.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**Policies and Customs**

*Jennings v. City of Miami*
Case No.

54.    The defendants' wrongful acts referenced  herein were part of a premeditated plan, developed by the municipal defendants, to enforce various laws in an unconstitutional manner, all aimed at preempting and suppressing plaintiffs' First and Fourth Amendment rights.

55.    Each of the acts complained of herein was taken, and each violation of plaintiffs' rights occurred, pursuant to the policies, practices and/or customs of the **MPD, MBPD, FTLPD** or **BSO,** designed to attempt to "police" the FTAA demonstrations by preventing expression in advance of or during its occurrence, and by subjecting plaintiffs and others to "political profiling," "herding," and unreasonable force, all without individualized probable cause.  Each act complained of was approved, condoned and/or ratified by persons of authority employed by defendants **CITY OF MIAMI, CITY OF MIAMI BEACH, CITY OF FORT LAUDERDALE** and  **BSO,** during the course of their participation in the Joint Security Plan.   Further violations of the plaintiffs' rights occurred   in the aftermath of the Joint Security Plan, by acts which include, but are not limited to, failing to inquire of the individual officers or to independently investigate the actions of the officers with forensic evidence, in an effort to determine which officers were responsible for the injuries and constitutional rights violations suffered by the Plaintiffs and many others at the demonstration; failing to determine which policies, customs and/or practices led to the injuries and constitutional rights violations suffered by the Plaintiffs and many others; failing to discipline or otherwise punish any wrongdoing which led to the injuries and constitutional rights violations suffered by the Plaintiffs and many others, or even making an effort to assess fault in this matter in order to know who should be subject to discipline for the harm suffered by the Plaintiffs; failing to contact the Plaintiffs and others in order to redress the wrong which they suffered and apologize for the harm inflicted upon the Plaintiffs by those working under their control and supervision, and to the contrary taking the public attitude that they did a great job in their handling of the Joint Security Plan and

*Jennings v. City of Miami*
Case No.

otherwise responding to the demonstration; and failing to properly investigate what errors were made by themselves, the supervisors and the officers in order to minimize or reduce the likelihood that the harm suffered by the Plaintiffs and many others will not happen to other demonstrators in the future by those under their supervision and control.

56.   In committing each of the violations of law complained of herein, the municipal defendants, their officials, agents and employees, were acting under color of state law. The acts complained of  displayed a conscious disregard for, and deliberate indifference to, plaintiffs' constitutional rights.

57.   At all times mentioned herein, defendants, their officers, employees, and agents acted pursuant to the official policies and customs of the defendant county and municipal governmental entities relating to the use of force.   These policies and customs were approved of, ratified, and/or enforced by the persons and/or entities with the authority to set policy for each of the government defendants, including the authorization and/or ratification of the use of so-called "less lethal" munitions, including "pepper-spray" projectiles, batons, tasers, chemical weapons, and other  uses of force against plaintiffs, as well as the deliberate limitation and disruption of lawful expressive activity.

58.   Certain defendants have publicly announced their assessment that the "counter-demonstration tactics" during November 2003 at the FTAA should be deemed a "model" for law enforcement operations at future demonstrations, and that these specific defendants intend to employ the same tactics in the future. Thus, the policies, practices and customs challenged herein remain in place and in full force and Defendants have every intention to employ the same policies in the future against Plaintiffs and others who seek to exercise their First Amendment rights in the City of Miami, evincing a ratification of said policies.

*Jennings  v. City of Miami*
Case No.

**The Security Plan**

59.    The overall operational security plan, involving some 40-plus governmental agencies, was characterized before the event by defendant **TIMONEY** as "the largest collaborative law enforcement operation in the history of Florida and perhaps in the country."    This plan required the multiple agencies involved to "submit to a single plan and a single command," with defendants **CITY OF MIAMI** and **TIMONEY** in a "primary leadership role."  The defendant **CITY OF MIAMI** and **MPD**, together with the FTAA Legal Training Committee (Legal Committee), developed specific "Rules of Engagement" that each agency was required to follow.    The Miami Police Department Steering Committee and the Joint Law Enforcement Command comprised the "command structure" for the event.    According to the After-Action Report issued by the City of Miami, the Joint Law Enforcement Command consisted of the heads of the agencies, or their delegated representatives, who were assigned "a major role or specific function for the security of the FTAA Ministerial."

60.    On information and belief, Plaintiffs allege that those *final policymaking individual defendants* who delegated authority to another command staff member to participate on their behalf in the Joint Law Enforcement Command, personally ratified, condoned and/or authorized his or her agency's participation, including the unlawful application of city ordinances and state statutes, during the course of the FTAA Ministerial Meetings and simultaneous demonstrations.

61.    Prior to November, 2003, the defendants began a disinformation campaign intended to demonize the demonstrators in the local press and in the Miami business community.  A Power Point presentation, created with the assistance of federal agencies, showed incidents of alleged protestor violence at other locations to create a climate of fear in Miami.  With

27

*Jennings v. City of Miami*
Case No.

buzz words such as "anarchist" and photographic images of property destruction allegedly caused by protesters, the defendants laid the groundwork for their plan to disrupt or forestall legal demonstration activity through arbitrary police actions, unconstitutional police lines, and the use of extraordinary violence against the demonstrators.

62.  A specific, although unwritten, part of the plan was the use of excessive force and/or preemptive arrests based on political and ideological profiling, **without any individualized probable cause** to believe that criminal conduct had already occurred or that such conduct was imminent.  The utilization of intense violence against unarmed demonstrators was intended, at least in part, to serve as a "message" to persons planning on engaging in protest activity in South Florida *in futuro*.

**Implementation of the Security Plan**

63.   On the day the AFL-CIO and many other organizations planned lawful rallies and marches, November 20, 2003, the defendants escalated the plan to limit protest by targeting and intimidating ideological demonstrators.  At various times during the day, the defendants deployed mobile police lines to interfere with freedom of association; encircled protestors with lines of riot-gear clad officers with weapons drawn; dispersed lawful assemblies; unlawfully detained, searched and arrested those opposed to the FTAA without individualized probable cause; and used brutal physical force, including a wide array of munitions as well as the release of chemical toxins, against peaceful demonstrators.

64.  On November 20th the AFL-CIO had a permit to hold a morning rally at Bayfront Park Amphitheater, with an afternoon march scheduled thereafter.  The Amphitheater is located just north of the Hotel Intercontinental, where the FTAA meetings were being held.

28

*Jennings v. City of Miami*
Case No.

65.   Defendants MPD and TIMONEY targeted the permitted morning AFL-CIO rally.  As people waited in line to be admitted to the Amphitheater, uniformed and undercover officers from defendant **MPD** and other law enforcement agencies identified several of the young people standing in line as targets for arrest. Without warning or provocation, defendants simply charged people standing in line, grabbed, beat, tasered, pepper-sprayed and arrested these young persons.

66.   Several hours after the morning AFL-CIO rally, the afternoon march occurred, leaving from the Amphitheater, marching through a cordoned-off section of downtown Miami, and returning thereafter to the Amphitheater.  After the march ended, a number of demonstrators remained on a grass lawn just west of Bayfront Park, near the Amphitheater.  Some members of this group began chanting near a line of police.

67.   After approximately ten minutes, a police representative informed the group that they could remain assembled there so long as the group remained peaceful , but within barely a minute of this announcement, officers opened fire on the demonstrators with so-called rubber bullets, pepper-spray, shotgun-based projectiles and other weapons, converting the entire area into a "no-protest" zone.

68.   Without warning, officers from **the Miami PD, Miami Beach PD, Fort Lauderdale PD and BSO** began marching slowly, shoulder-to-shoulder, northbound on Biscayne Blvd., continuing to fire rubber bullets, pepper-spray beanbags, shotgun-based projectiles, and other weapons at unarmed demonstrators.   At this time **defendants TIMONEY, FERNANDEZ, BURDEN, CANNON, YERO, BROOKS and SPECTOR** were all either on or just behind the advancing police line;  all were acting in a supervisory capacity at the time, and any of them could have interceded at any time to prevent the continued use of

*Jennings v. City of Miami*
Case No.

excessive force on the unarmed individuals.


69. The SWAT teams and other "field forces" from Defendants **MPD, MBPD, FTLPD and BSO** continued to fire at and march toward the demonstrators for several blocks up Biscayne Boulevard after the AFL-CIO event. Officers targeted  Plaintiffs, shooting at them with less-lethal weapons. After the severe injuries to the plaintiffs, the police line march northward on Biscayne Blvd. until NE 3rd Street, when the line pivoted and began forcing the encircled demonstrators west on NE 3rd Street, where the assault on them continued.


**Use of Force**


70. One common factor in this massive episode of police misconduct was **the use of force to intimidate and stifle dissent, coupled with the complete absence of any individualized probable cause to disperse or arrest those gathered to engage in lawful dissent.** The actions of the defendants in violating the rights of the FTAA demonstrators were so egregious that one state criminal court judge, who happened to be in the area during the activity on Biscayne Blvd. and who was an eyewitness to this massive discharge of weaponry by the SWAT forces without justification,  stated in open court that he witnessed "no less than 20 felonies committed by police officers."


71. This use of force by defendants was especially egregious, with defendants repeatedly beating and shooting unarmed individuals, such as Plaintiffs, insofar as these victims of brutality : (1) had violated no law; (2) posed no threat to the safety of officer or others, and (3) were not evading arrest.

*Jennings v. City of Miami*
Case No.

72.   The egregious use of force on November 20th against peaceful, law-abiding demonstrators, such as the plaintiffs, was far outside the bounds of permissible force insofar as it involved potentially "lethal" force, including, but not limited to baton strikes to the heads of demonstrators, shooting less-lethal munitions and projectiles at close range and at the heads and upper-torsos of demonstrators, and repeatedly spraying pepper spray and other chemical irritants directly into the eyes, noses and mouths of non-violent protestors who were "herded" or otherwise trapped by police.   It has been asserted under oath by a MPD official that it was defendant **YERO** who ordered the **Miami Beach PD** LEOs to begin discharging tear gas.

73.   The staggering number of projectiles and other weapons fired at the plaintiffs and other unarmed demonstrators may never be known.   One MPD memo admitted to 249 weapon "deployments"; another MPD SWAT Memo from January 2004 acknowledged that there were 482 deployments.[2]

74.   Defendant **TIMONEY** asserted in public statements prior to the commencement of the FTAA Ministerial meeting that the **MPD** and other agencies would use force to "prevent" violence, but in fact the events of November 20th in Miami were, in essence, a *police riot*. Indeed, knowing in advance that they would engage in such wholesale and deliberate violations of the demonstrators' First and Fourth Amendment rights, most supervisors and officers obscured their identities behind riot gear with face shields, with no visible agency

---

[2]   "Documents provided by the MPD reveal that Miami police deployed thirty 40-MM Bean Bag rounds, fifty-seven 12-gauge Drag-Stabilized Bean Bags, thirty-two 40-MM Blue Exact Impact Sponge Rounds, fifty three 40-MM Orange Exact Impact /OC (pepper spray) rounds and 310 Pepper Balls."   Miami Civilian Investigative Panel Report, *citing* Guzman, Cmdr. A., *Memorandum: SWAT Less Lethal Deployment FTAA*, January 21, 2004.

*Jennings v. City of Miami*
Case No.

markings, badge numbers or name identification tags.


**"Herding"**


75.   The tactic of **herding** utilized by the defendants on November 20, 2003 consisted of the creation of a large *"encirclement perimeter"* and the use of hundreds of heavily-armed, riot gear-clad LEOs in SWAT units and FTAA-specific "field forces," aligned in a *skirmish line* to force the demonstrators in a desired direction through the use of *intensely excessive force*. It was the specific intent of the defendants through their utilization of the tactic of herding to restrain without justification the Plaintiffs' freedom of movement.   This tactic constituted a **seizure** insofar as it was clearly a governmental termination of freedom of movement through intentionally applied means.


76.   The initial encirclement perimeter at approximately 3:30 PM on November 20th was as follows: on the **southern boundary** the police skirmish line formed from  Biscayne Bay on the east side to the buildings on Biscayne Blvd. on the west side, with the huge FTAA-specific security fence surrounding the Intercontinental Hotel to the rear of the skirmish line; the **eastern boundary** was Biscayne Bay near the Intercontinental Hotel - a little north of that point the Bayfront Amphitheater was the eastern boundary, and north of the amphitheater several armored personnel carriers and the Hialeah PD field force blocked off access to Bayside and the port area to the east; on the **western boundary** a line of riot police and bicycle response platoons blocked movement in that direction; on the **northern boundary**, the Miami-Dade County PD blocked movement.


77.    The ***herding process*** began with the movement of the police line northward with

*Jennings v. City of Miami*
Case No.

hundreds of officers beating their shields with batons to create disorienting noise. As reported by a MPD field supervisor, from east to west the units on this skirmish line consisted of the **Miami Beach PD** to the east, then the **Miami PD** units, then **BSO** units, and all the way on the west side on Biscayne Blvd. was the **Fort Lauderdale PD** Bravo unit.

78.   The LEOs in the line began to use their batons to beat unarmed demonstrators and then commenced the spraying of pepper spray up and down the line; this coincided with the use of bean bags (sacks filled with pellets), pepper spray balls, OC spray rounds, and tear gas. Plaintiffs submitted to a show of authority by retreating from the oncoming skirmish line. After the plaintiffs were injured the skirmish line continued with the herding on the demonstrators by pushing them northward.

**Supervisory Approval of Excessive Force**

79.   The above-referenced unconstitutional acts including herding, encirclement and excessive force, were planned and condoned by the Joint Law Enforcement Command. In an after action video taken by BSO, Defendant Brooks indicated that "nobody did what they weren't supposed to do and everybody did it in a professional manner." BSO Sgt. Mike Kallman told the BSO field force that the Miami PD was very impressed with BSO's conduct. Furthermore, Capt. John Brooks made clear that the unconstitutional acts were part of a plan to be a "winning team" during the FTAA and that the law enforcement officers would "go home undefeated." These actions and statements indicate that Capt. Brooks and other supervisors thus approved, condoned and ratified all actions taken by their subordinates against the Plaintiffs and others similarly situated.   The intentional herding of the peaceful protestors is admitted by Capt. Brooks in the same after action video made by

33

*Jennings  v. City of Miami*
Case No.

BSO, when Brooks indicated that the Miami Police Department "drew the line in the sand," and told the BSO field force that "we're going to turn [the protestors]."

80.  In addition to planning and condoning the unconstitutional acts, Defendant Brooks and other BSO supervisory personnel were amused by the egregious behavior of officers under their command.  In the BSO after-action video, a BSO officer referred to demonstrators such as the Plaintiffs as "scurrying cockroaches," and mocked the injuries incurred by peaceful demonstrators, such as the Plaintiffs.   The video reveals that BSO Capt. Brooks laughed at television news reports of a peaceful protestor being hit "smack dab in the middle of the head" and said watching the video was the "good news" of the day.  A BSO field force member can be heard referring to an injured protestor in the following manner: "Somewhere there's a fat boy hurtin' real bad."  This video evidence indicates that this misconduct against the Plaintiffs, and the ratification and approval by their supervisors, were performed due to a belief shared by all Defendants that the Plaintiffs should be treated contemptuously and as less than human, that Plaintiffs are not entitled to their constitutional rights, and that the constitutional violations alleged herein were committed knowingly, wilfully and intentionally.

### CLASS ACTION ALLEGATIONS

81.   Plaintiffs bring this action on their own behalf and on behalf of a class of all other persons similarly situated pursuant to Rule 23(b)(3), Federal Rules of Civil Procedure.  The damages class is  defined as those persons who were present on or near Biscayne Blvd. on November 20, 2003, between 3:30 p.m. and 5:30 p.m., who did not engage in any conduct justifying the Defendants' use of force against them, and who were subjected to the use of force, including but not limited to those who 1) were shot with projectiles, struck with batons, 2) were exposed to chemical agents, 3)  were prevented from leaving the area near Biscayne Blvd. by the "herding" and "encirclement" tactics as they attempted to disperse,

*Jennings v. City of Miami*
Case No.

or 4) although not physically injured, were driven from the Biscayne Blvd. area as a result of the Defendants' unlawful use of force and/or were subject to the threat of force and driven out of the area under the threat of the use of force. This class is inclusive of people present in order to peacefully protest and those otherwise engaged in lawful activities.

82.     In accordance with Fed. R.Civ. P. Rule 23(a), the class is so numerous that joinder of all members is impracticable.  Plaintiffs do not know the exact number of class members. Plaintiffs are informed and believe and thereon allege that there are in excess of 300 members of the class.

83.     In accordance with Fed. R. Civ. P. 23(a), there are questions of fact common to the class.  Plaintiffs are informed and believe and thereon allege  that the common questions of fact include but are not limited to the following:

    a.    What danger, if any, the peaceful participants presented when defendants allegedly declared the gathering an unlawful assembly and ordered the peaceful participants to disperse;

    b.    What defendants told the peaceful participants regarding the declaration of an unlawful assembly and how they should disperse;

    c.    What opportunity defendants gave the peaceful participants to disperse before attacking them with projectiles, batons and other weapons;

    d.    What degree of force defendants used against the peaceful participants *e.g.*, what degree of force does shooting a person with a "less than lethal" weapon actually represent;

    e.    What warnings, if any, defendants gave before using force against the peaceful participants;

*Jennings v. City of Miami*
Case No.

    f.     Whether defendants declared the protest an unlawful assembly for the purpose of interfering with the peaceful participants' right to freedom of speech;

    g.     Whether defendants used force against the peaceful participants for the purpose of interfering with the peaceful participants' right to freedom of speech;

    h.     Whether defendants engaged in content-discrimination and viewpoint-discrimination.

84.    In accordance with Fed. R. Civ. P. 23(a), there are questions of law common to the class. Plaintiffs are informed and believe and thereon allege that the common questions of law include but are not limited to, the following:

    a.     Whether defendants were legally justified in declaring the gathering an unlawful assembly;

    b.     Whether (assuming the dispersal order was unlawful) any use of force was lawful;

    c.     Whether (assuming the dispersal order was lawful) defendants gave peaceful participants an adequate opportunity to disperse;

    d.     What degree of force (assuming the dispersal order was lawful), if any, defendants were permitted to use to disperse the peaceful participants;

    e.     Whether defendants were permitted to use force, including firing projectiles at peaceful participants, without warning;

    f.     Whether defendants were permitted to randomly fire into the dispersing peaceful participants;

    g.     Whether the force defendants used was constitutionally reasonable.

*Jennings v. City of Miami*
Case No.

85.     In accordance with Fed. R. Civ. P. 23(a), the claims of the representative plaintiffs are typical of the class they represent. Each representative plaintiff was present on or near Biscayne Blvd. on November 20, 2003,   between the hours of 3:30 p.m. and 5:30 p.m. Each representative plaintiff was subjected to force on or near Biscayne Blvd. as he or she attempted to disperse from the area.    No representative plaintiff did anything to attack or threaten to attack any person, or interfere with any lawful action of anyone, or resist arrest, or escape.  Except for their presence on or near Biscayne Blvd., and peaceful, verbal, non-violent protests, and observing defendants, plaintiffs did nothing.  Defendants had no legal justification for ordering any representative plaintiff to disperse and no legal justification for using force against any representative plaintiff.

86.     Each representative plaintiff has the same interests and suffered the same type injuries as the class members.  The claims of each representative plaintiff arose because of the Defendants' alleged dispersal orders and their use of force against the peaceful participants.  The claims of the representative plaintiffs are based upon the same legal theories as the claims of the class members.  Each representative class member suffered actual physical injuries as a result of Defendants' alleged dispersal orders and Defendants' use of force.

87.     In accordance with Fed. R. Civ. P. 23(a), the representative plaintiffs will fairly and adequately protect the interests of the class.  The interests of the representative plaintiffs are consistent with and not antagonistic to the interests of the class.

88.     In accordance with Fed. R.Civ.P. 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members.  Plaintiffs are informed and believe and thereon allege that the questions of law

37

*Jennings v. City of Miami*
Case No.

and/or fact which predominate over any question affecting only individual members include whether Defendants improperly declared an unlawful assembly depriving peaceful participants of their First Amendment rights, whether Defendants used excessive force against peaceful participants, whether Defendants' motivation was to deprive the peaceful participants of their First Amendment rights, and whether Defendants engaged in content-discrimination and viewpoint-discrimination.

89.     In accordance with Fed. R.Civ.P. 23(b)(3), this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties.  Plaintiffs are informed and believe and thereon allege that the interest of members of the class in individually controlling the prosecution of a separate action is low, in that most class members would be unable to individually prosecute any action at all.  Plaintiffs are informed and believe and thereon allege that the amounts at stake for individuals are so small that separate suits would be impossible or impracticable.  Plaintiffs are informed and believe and thereon allege that most members of the class will not be able to find counsel to represent them.  Plaintiffs are informed and believe that defendants have no or virtually no records or evidence of any kind justifying any use of force against individual peaceful participants, and that defendants' only justifications for any use of force against peaceful participants is based on facts which apply to all peaceful participants equally.

90.     Plaintiffs are informed and believe that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, date and time, *i.e.,* in the vicinity of Biscayne Blvd.on November 20,  2003, between 3:30 p.m. and 5:30 p.m., and it will promote judicial efficiency to resolve the common questions of law and fact in one forum, rather than in multiple courts.

*Jennings v. City of Miami*
Case No.

91.   Plaintiffs do not know the identities of all of the class members.  Plaintiffs are aware of the identities of approximately 80 class members.


92.   In accordance with Fed. R. Civ. P. 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.   Plaintiffs contemplate notice through organizational "listserves" devoted to globalization and social justice issues. Plaintiffs contemplate that the notice will inform class members of the following:

   a.   The pendency of the class action, and the issues common to the class;

   b.   The nature of the action;

   c.   Their right to 'opt out' of the action within a given time, in which event they will not be bound by a decision rendered in the class action;

   d.   Their right, if they do not 'opt out,' to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named plaintiffs and their counsel; and

   e.   Their right, if they do not 'opt out,' to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues, adverse to the class.


## CAUSES OF ACTION

93.   As to each cause of action delineated below in Counts One through Thirty-Two, plaintiffs advance their federal constitutional claims against the governmental entities and supervisory officials, as state actors, through the operation of the Fourteenth Amendment.


## COUNT ONE
### *Monell* Claim - Official Policies to Suppress Protected Speech and Assembly

*Jennings v. City of Miami*
Case No.

## (42 USC § 1983 – Violation of First Amendment)
## Against CITY OF MIAMI

94.    Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

95.    At all times relevant hereto, the City Commission of the City of Miami was the final policymaker of the City of Miami for purposes of adopting ordinances and other policies formally regulating constitutionally-protected expression and assembly within the city's boundaries.

96.    In November 2003 the Miami City Commission adopted an ordinance which made illegal any assembly of 8 persons or more lasting more than 30 minutes, and which also restricted the means of expression by restricting possession of numerous objects commonly used in peaceful demonstrations.  City of Miami, Fla. Code § 54-6.1 (2003).  This ordinance was enacted just prior to the beginning of the FTAA Ministerial Meetings with the express intent of limiting First Amendment-protected speech and assembly, and to provide a pretext for law enforcement agencies to disrupt peaceful, lawful political assemblies in November 2003.  This ordinance, unconstitutional on its face, was used as a pretext on November 20, 2003 to justify assaults upon, and arrests of, peaceful demonstrators.

97.    The defendant City of Miami entered into "Mutual Aid Agreements" with numerous governmental entities, whereby the city benefitted from the use of police officers from many jurisdictions.

98.    The City of Miami, through its police department and with the acquiescence of the

40

*Jennings v. City of Miami*
Case No.

city commission,   adopted: a "joint operational security plan" ("the security plan") encompassing more than 40 law enforcement agencies (as more fully described hereinabove), the formation of the Joint Law Enforcement Command; the unwritten components of the plan, which included political and ideological profiling, harassment and herding of protestors.   A key, albeit unwritten,  purpose of the plan was to severely limit opportunities for First Amendment-protected core political speech and assembly during the FTAA Ministerial Meetings.

99.   The adoption by the Miami City Commission of ordinances restricting speech and assembly, and the adoption *by the commission* and/or *the city's final policymaker for police activity* of the mutual aid agreements and the joint operational security plan, led to the implementation of these ordinances and policy agreements by the Miami PD and other agencies in a fashion which proximately caused the deprivation of First Amendment rights of Plaintiffs and other demonstrators during the FTAA Ministerial Meetings near Biscayne Blvd. in Miami on November 20, 2003.

## COUNT TWO
### *Monell* Claim - Suppression of Protected Speech and Assembly by Final Policymaker
### (42 USC § 1983 – Violation of First Amendment)
### Against CITY OF MIAMI

100.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

101.   The defendant City of Miami entered into "Mutual Aid Agreements" with numerous governmental entities, whereby the city benefitted from the use of police officers from

41

*Jennings v. City of Miami*
Case No.

many jurisdictions.

102.   The City of Miami also adopted: a "joint operational security plan" ("the security plan") encompassing more than 40 law enforcement agencies (as more fully described hereinabove); the formation of the Joint Law Enforcement Command; the unwritten components of the plan, which included political and ideological profiling, harassment and herding of protestors.   A key, albeit unwritten, purpose of the plan was to severely limit opportunities for First Amendment-protected core political speech and assembly during the FTAA Ministerial Meetings.

103.   Chief TIMONEY was the final policymaker for purposes of implementation of these policy agreements by the Miami PD and other agencies in a fashion which proximately caused the deprivation of First Amendment rights of Plaintiffs and other demonstrators during the FTAA Ministerial Meetings near Biscayne Blvd. in Miami on November 20, 2003.  TIMONEY'S decisions on these matters were final and not reviewable, and within the scope of his authority as Chief of Police.

104.   TIMONEY designed the field plan that included formation of police lines to surround demonstrators on all sides – herding them like cattle.  On November 20, 2003, at approximately 3:30 p.m., police lines formed marching north, breaking up the lawful assembly and interrupting First Amendment-protected core political speech by the plaintiffs. The herding tactics, along with the use of "less-lethal" weapons by police, severely limited rights of First Amendment expression, assembly, and association.

## COUNT THREE
### *Monell* Claim - Official Policies Resulting in Unlawful Seizure

*Jennings v. City of Miami*
Case No.

### (42 USC § 1983 – Violation of Fourth Amendment)
### Against CITY OF MIAMI

105.    Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

106.    At all times relevant hereto, the City Commission of the City of Miami was the final policymaker of the City of Miami for purposes of adopting ordinances and other policies formally regulating constitutionally-protected expression and assembly within the city's boundaries.

107.    In October 2003 the Miami City Commission adopted an ordinance which made illegal any assembly of 8 persons or more lasting more than 30 minutes, and which restricted the means of expression by restricting possession of certain objects commonly used in peaceful demonstrations.  City of Miami, Fla. Code § 54-6.1 (2003).  This ordinance was enacted just prior to the beginning of the FTAA Ministerial Meetings with the express intent of limiting First Amendment-protected speech and assembly, and to provide a pretext for law enforcement agencies to disrupt peaceful, lawful political assemblies in November 2003.   This ordinance, unconstitutional on its face, was used as a pretext on November 20 2003 to justify assaults upon, and arrests of, peaceful demonstrators.

108.    The defendant City of Miami entered into "Mutual Aid Agreements" with numerous governmental entities, whereby the city benefitted from the use of police officers from many jurisdictions.

109.    The City of Miami, through its police department and with the acquiescence of the

43

*Jennings v. City of Miami*
Case No.

city commission,   adopted: a "joint operational security plan" ("the security plan")
encompassing more than 40 law enforcement agencies (as more fully described
hereinabove); the formation of the Joint Law Enforcement Command; the unwritten
components of the plan, which included political and ideological profiling, harassment and
herding of protestors.   A key, albeit unwritten, purpose of the plan was to severely limit
opportunities for First Amendment-protected core political speech and assembly during the
FTAA Ministerial Meetings by encouraging Fourth Amendment violations, specifically
seizure through excessive force by the use of "less lethal" weapons without any
individualized probable cause, and seizure through herding techniques.

110.   The adoption by the Miami City Commission of ordinances restricting speech and
assembly, and the adoption *by the commission* and/or *the city's final policymaker for
police activity* of the mutual aid agreements and the joint operational security plan, led to
the implementation of these ordinances and policy agreements by the Miami PD and other
agencies in a fashion which proximately caused the deprivation of Fourth Amendment
rights of Plaintiffs and other demonstrators during the FTAA Ministerial Meetings near
Biscayne Blvd. in Miami on November 20, 2003.

## COUNT FOUR
*Monell* Claim - Policy of Unlawful Seizures  by Final Policymaker
(42 USC § 1983  – Violation of Fourth Amendment–Unreasonable Seizure)
Against CITY OF MIAMI

111.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of
Paragraphs 1-93, as if set forth at length herein.

112.   The defendant City of Miami entered into "Mutual Aid Agreements" with numerous

44

*Jennings  v. City of Miami*
Case No.

governmental entities, whereby the city benefitted from the use of police officers from many jurisdictions.

113.   The City of Miami also adopted: a "joint operational security plan" ("the security plan") encompassing more than 40 law enforcement agencies (as more fully described hereinabove);  the formation of the Joint Law Enforcement Command, and the adoption of the unwritten components of the plan, which included political and ideological profiling, harassment and herding of protestors.    A key, albeit unwritten,  purpose of the plan was to severely limit opportunities for First Amendment-protected core political speech and assembly during the FTAA Ministerial Meetings by encouraging Fourth Amendment violations, specifically seizure through excessive force by the use of "less lethal" weapons, without any individualized probable cause,  and seizure through herding techniques.

114.   Chief TIMONEY was the final policymaker for purposes of implementation of these policy agreements by the Miami PD and other agencies in a fashion which proximately caused the deprivation of Fourth Amendment rights of Plaintiffs and other demonstrators during the FTAA Ministerial Meetings near Biscayne Blvd. in Miami on November 20, 2003.  TIMONEY'S decisions on these matters were final and not reviewable, and within the scope of his authority as Chief of Police.

115.   TIMONEY designed the field plan that included formation of police lines to surround demonstrators on all sides–herding them like cattle.   On November 20, 2003, at approximately 3:30 p.m., police lines formed marching north, forcing demonstrators to move north, breaking up the lawful assembly and interrupting First Amendment-protected core political speech of the defendants.   These herding tactics and the excessive force used by the police infringed upon the plaintiffs' Fourth Amendment right to be free from

*Jennings v. City of Miami*
Case No.

unreasonable seizure, while conducting themselves in a peaceful, lawful manner.

## COUNT FIVE

### *Monell* Claim - Policy of Excessive Force by Final Policymaker
### (42 USC § 1983 – Violation of Fourth Amendment–Excessive Force)
### Against CITY OF MIAMI

116.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

117.   The defendant City of Miami entered into "Mutual Aid Agreements" with numerous governmental entities, whereby the city benefitted from the use of police officers from many jurisdictions.

118.   The City of Miami also adopted: a "joint operational security plan" ("the security plan") encompassing more than 40 law enforcement agencies (as more fully described hereinabove);  the formation of the Joint Law Enforcement Command, and the adoption of the unwritten components of the plan, which included political and ideological profiling, harassment and herding of protestors.    A key, albeit unwritten,  purpose of the plan was to severely limit opportunities for First Amendment-protected core political speech and assembly during the FTAA Ministerial Meetings by encouraging Fourth Amendment violations, specifically seizure through excessive force by the use of "less lethal" weapons, without any individualized probable cause,  and seizure through herding techniques.

119.   Chief TIMONEY was the final policymaker for purposes of implementation of these policy agreements by the Miami PD and other agencies in a fashion which proximately

*Jennings v. City of Miami*
Case No.

caused the deprivation of Fourth Amendment rights of Plaintiffs and other demonstrators during the FTAA Ministerial Meetings near Biscayne Blvd. in Miami on November 20, 2003. TIMONEY'S decisions on these matters were final and not reviewable, and within the scope of his authority as Chief of Police.

120.    TIMONEY designed the field plan that included formation of police lines to surround demonstrators on all sides–herding them like cattle.   On November 20, 2003, at approximately 3:30 p.m., police lines formed marching north, forcing demonstrators to move north, breaking up the lawful assembly and interrupting First Amendment-protected core political speech of the defendants.   Even if the circumstances of the demonstration had warranted effectuation of seizures by use of force, these herding tactics and the excessive force used by the police authorized a quantum of force constituting excessive force, and thereby infringed upon the plaintiffs' Fourth Amendment rights to be free from the use of unreasonably "excessive force" independent of the legality or illegality of the seizure.

## COUNT SIX
### *Monell* Claim - Official Policies to Suppress Protected Speech and Assembly
### (42 USC § 1983 – Violation of First Amendment)
### Against CITY OF MIAMI BEACH, CITY OF FORT LAUDERDALE, and BSO

121.    Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

122.    The defendants, City of Miami Beach, City of Fort Lauderdale, and BSO entered into "Mutual Aid Agreements" with defendant City of Miami and numerous other governmental entities, with the   approval and/or full acquiescence of the final policymakers for the

*Jennings  v. City of Miami*
Case No.

defendants, City of Miami Beach, City of Fort Lauderdale, and BSO.


123.   The City of Miami Beach, the City of Fort Lauderdale, and BSO, with the express approval and/or full acquiescence of their final policymakers,  adopted the "joint operational security plan" ("the security plan"), and also adopted the formation of the Joint Law Enforcement Command, in which all agencies were given an equal voice in the decision making process of the FTAA security plan in the planning stage.   The City of Miami Beach, the City of Fort Lauderdale, and BSO also consented to other components of the plan, which included political and ideological profiling, harassment and herding of protestors.      A key, albeit unwritten,  purpose of the plan was to severely limit opportunities for First Amendment-protected core political speech and assembly during the FTAA Ministerial Meetings.

124.   Moreover, the City of Miami Beach, the City of Fort Lauderdale, and BSO, with the express approval and/or full acquiescence of their final policymakers, submitted to the authority of the unified command of the Joint Law Enforcement Operations Center during the week of the FTAA Ministerial Meetings.   For instance, an alleged dispersal order from a Miami Police Department major on November 20, 2003, near the railroad tracks at 5:00 p.m. was followed by arrests by BSO deputies for failure to disperse.


125.   The adoption of the mutual aid agreements and the joint operational security plan, led to the implementation of these  policy agreements by City of Fort Lauderdale, City of Miami Beach, and BSO in a fashion which proximately caused the deprivation of First Amendment rights of Plaintiffs and other demonstrators during the FTAA Ministerial Meetings near Biscayne Blvd. in Miami on November 20, 2003.


## COUNT SEVEN

*Jennings v. City of Miami*
Case No.

## *Monell* Claim - Official Policies Resulting in Unlawful Seizure
### (42 USC § 1983 – Violation of Fourth Amendment)
### Against CITY OF MIAMI BEACH, CITY OF FORT LAUDERDALE, and BSO

126.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

127.   The defendants, City of Miami Beach, City of Fort Lauderdale, and BSO entered into "Mutual Aid Agreements" with defendant City of Miami and numerous other governmental entities, with the express approval and/or full acquiescence of the final policymakers for the defendants, City of Miami Beach, City of Fort Lauderdale, and BSO.

128.   The City of Miami Beach, the City of Fort Lauderdale, and BSO, with the express approval and/or full acquiescence of their final policymakers, adopted: a "joint operational security plan" ("the security plan"); the formation of the Joint Law Enforcement Command, in which all agencies were given a participatory role in the decision-making process of the FTAA security plan.   The City of Miami Beach, the City of Fort Lauderdale, and BSO also consented to other components of the plan, which included political and ideological profiling, harassment and herding of protestors.    A key, albeit unwritten, purpose of the plan was to severely limit opportunities for First Amendment-protected core political speech and assembly during the FTAA Ministerial Meetings by encouraging Fourth Amendment violations, including seizure through excessive force and herding without individualized probable cause.

129.   Moreover, the City of Miami Beach, the City of Fort Lauderdale, and BSO, with the express approval and/or full acquiescence of their final policymakers, submitted to the

*Jennings  v. City of Miami*
Case No.

authority of the unified command of the Joint Law Enforcement Operations Center during the week of the FTAA Ministerial Meetings.   For instance, an alleged dispersal order from a Miami Police Department major on November 20, 2003, near the railroad tracks was followed by arrests by BSO deputies for failure to disperse.

130.   The adoption of the mutual aid agreements and the joint operational security plan, led to the implementation of these  policy agreements by City of Fort Lauderdale, City of Miami Beach, and BSO in a fashion which proximately caused the deprivation of Fourth Amendment rights of Plaintiffs and other demonstrators during the FTAA Ministerial Meetings near Biscayne Blvd. in Miami on November 20, 2003.

## COUNT EIGHT
### Supervisory Liability - Directing Unlawful Acts
### (42 USC § 1983  – Violation of First  Amendment)
### Against TIMONEY

131.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

132.   TIMONEY was an official decisionmaker regarding the City of Miami's FTAA law enforcement operation, including the surveillance of law-abiding organizations and churches, the deployment of SWAT teams, field forces, bicycle response platoons, tanks, and helicopters, the selection of weapons used against unarmed demonstrators, and other activity comprising the deprivation of plaintiffs' constitutional rights

*Jennings v. City of Miami*
Case No.

133.   Chief Timoney and Major Adam Burden were together on the grass field just east of Biscayne Boulevard on November 20, 2003, at the precise time in the afternoon that plaintiffs were assaulted by the police line; at that moment, Chief Timoney and Major Burden were within less than 100 feet from the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and the discharge of tear gas, bean bags and pepper spray into the gathering of unarmed demonstrators.

134.   On information and belief, Chief Timoney approved the orders given by Deputy Chief Fernandez and Captain Cannon, thereby permitting the police line to continue marching northward while beating unarmed demonstrators and discharging hundreds of projectiles and tear gas.

135.   Chief Timoney's approval of the aforementioned orders was the proximate cause of the deprivation of the plaintiffs' First Amendment rights of speech and assembly.

136.   As a direct result of the defendant's approval of the aforementioned orders, the plaintiffs suffered the above-referenced constitutional deprivations, permanent physical injuries, and other damages.

## COUNT NINE
### Supervisory Liability - Directing Unlawful Acts
### (42 USC § 1983 – Violation of Fourth Amendment–Unreasonable Seizure)
### Against TIMONEY

137.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of

*Jennings  v. City of Miami*
Case No.

Paragraphs 1-93, as if set forth at length herein.


138.   TIMONEY was a final policymaker and/or official decisionmaker regarding the City of Miami's FTAA law enforcement operation, including the surveillance of law-abiding organizations and churches, the deployment of SWAT teams, field forces, bicycle response platoons, tanks, and helicopters, the selection of weapons used against unarmed demonstrators, and other activity comprising the deprivation of plaintiffs' constitutional rights


139.   Chief Timoney and Major Adam Burden were together on the grass field just east of Biscayne Boulevard on November 20, 2003, at the precise time in the afternoon that plaintiffs were assaulted by the police line; at that moment, Chief Timoney and Major Burden were within less than 100 feet from the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and the discharge of tear gas, pepper spray, bean bags and other projectiles  into the gathering of unarmed demonstrators.


140.   On information and belief, Chief Timoney approved the orders given by Deputy Chief Fernandez and Captain Cannon, thereby permitting the police line to continue marching northward while beating unarmed demonstrators and discharging hundreds of projectiles and chemical agents.   The discharge of projectiles constituted the use of deadly force.


141.   Chief Timoney's approval of the aforementioned orders was the proximate cause of the deprivation of the plaintiffs' Fourth Amendment rights to be free from unreasonable seizure, while conducting themselves in a peaceful, lawful manner.

*Jennings v. City of Miami*
Case No.

142.   As a direct result of the defendant's approval of the aforementioned orders, the plaintiffs suffered the above-referenced constitutional deprivations, permanent physical injuries, and other damages.

### COUNT TEN
### Supervisory Liability - Directing Unlawful Acts
### (42 USC § 1983 – Violation of Fourth Amendment–Excessive Force)
### Against TIMONEY

143.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

144.   TIMONEY was a final policymaker and/or official decisionmaker regarding the City of Miami's FTAA law enforcement operation, including the surveillance of law-abiding organizations and churches, the deployment of SWAT teams, field forces, bicycle response platoons, tanks, and helicopters, the selection of weapons used against unarmed demonstrators, and other activity comprising the deprivation of plaintiffs' constitutional rights

145.   Chief Timoney and Major Adam Burden were together on the grass field just east of Biscayne Boulevard on November 20, 2003, at the precise time in the afternoon that plaintiffs were assaulted by the police line; at that moment, Chief Timoney and Major Burden were within less than 100 feet from the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and the discharge of tear gas, pepper spray, bean bags and other projectiles into the gathering of unarmed demonstrators.

*Jennings v. City of Miami*
Case No.

146.   On information and belief, Chief Timoney approved the orders given by Deputy Chief Fernandez and Captain Cannon, thereby permitting the police line to continue marching northward while beating unarmed demonstrators and discharging hundreds of projectiles and chemical agents.   The discharge of projectiles constituted the use of deadly force.

147.   Even if the circumstances of the demonstration had warranted effectuation of seizures by use of force, Chief Timoney's approval of the aforementioned orders authorized a quantum of force constituting excessive force, and was the proximate cause of the deprivation of the plaintiffs' Fourth Amendment rights to be free from the use of unreasonably "excessive force" independent of the legality or illegality of the seizure.

148.   As a direct result of the defendant's approval of the aforementioned orders, the plaintiffs suffered the above-referenced constitutional deprivations, permanent physical injuries, and other damages.

**COUNT ELEVEN**

**Supervisory Liability  -  Directing Unlawful Acts**
**(42 USC § 1983  – Violation of First  Amendment)**
**Against FERNANDEZ**

149.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

150.   Defendant Fernandez, Deputy Chief of the Miami PD and number two in the chain-of-command behind Chief Timoney, was an official decision maker in his role as Incident

*Jennings v. City of Miami*
Case No.

Commander. Defendant Fernandez made the decision to utilize "herding techniques" to corral the demonstrators during the afternoon of November 20, 2003, by ***personally directing*** the **police lines to march northward and disrupt the lawful assembly**, abrogating the First Amendment rights of the plaintiffs and others and commencing the unlawful seizure of the plaintiffs and others in the peaceful gathering, which decision deprived the plaintiffs of their constitutional rights.

151.   On November 20, 2003, at the time that plaintiffs were assaulted by the police line, Fernandez was situated on Biscayne Blvd. and the grass field, just to the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and the discharge of tear gas, bean bags and pepper spray into the gathering of unarmed demonstrators.

152.   Fernandez's order and subsequent command actions were a proximate cause of the deprivation of plaintiffs' First Amendment rights of speech, assembly, and association.

153.   As a direct result of the Defendant's order, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries, and other damages.

## COUNT TWELVE
### Supervisory Liability - Directing Unlawful Acts
### (42 USC § 1983 – Violation of Fourth Amendment–Unreasonable Seizure)
### Against FERNANDEZ

154.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

*Jennings v. City of Miami*
Case No.

155.   Defendant Fernandez, Deputy Chief of the Miami PD and number two in the chain-of-command behind Chief Timoney, was an official decision maker in his role as Incident Commander. Defendant Fernandez made the decision to utilize "herding techniques" to corral the demonstrators during the afternoon of November 20, 2003, by ***personally directing*** the **police lines to march northward and disrupt the lawful assembly**, abrogating the First Amendment rights of the plaintiffs and others and commencing the unlawful seizure of the plaintiffs and others in the peaceful gathering, which decision deprived the plaintiffs of their constitutional rights.

156.   On November 20, 2003, at the time that plaintiffs were assaulted by the police line, Fernandez was situated on Biscayne Blvd. and the grass field, just to the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and the discharge of tear gas, pepper spray, bean bags, and other projectiles  into the gathering of unarmed demonstrators.   The discharge of projectiles constituted the use of deadly force.

157.   Fernandez's order and subsequent command actions were a proximate cause of the deprivation of plaintiffs' Fourth Amendment right to be free from unreasonable seizure, while conducting themselves in a peaceful, lawful manner.

158.   As a direct result of the Defendant's order, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries, and other damages.

**COUNT THIRTEEN**
**Supervisory Liability  -  Directing Unlawful Acts**
**(42 USC § 1983  – Violation of Fourth  Amendment–Excessive Force)**
**Against FERNANDEZ**

*Jennings v. City of Miami*
Case No.

159.    Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

160.    Defendant Fernandez, Deputy Chief of the Miami PD and number two in the chain-of-command behind Chief Timoney, was an official decision maker in his role as Incident Commander. Defendant Fernandez made the decision to utilize "herding techniques" to corral the demonstrators during the afternoon of November 20, 2003, by ***personally directing*** the **police lines to march northward and disrupt the lawful assembly**, abrogating the First Amendment rights of the plaintiffs and others and commencing the unlawful seizure of the plaintiffs and others in the peaceful gathering, which decision deprived the plaintiffs of their constitutional rights.

161.    On November 20, 2003, at the time that plaintiffs were assaulted by the police line, Fernandez was situated on Biscayne Blvd. and the grass field, just to the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and the discharge of tear gas, pepper spray, bean bags, and other projectiles  into the gathering of unarmed demonstrators.   The discharge of projectiles constituted the use of deadly force.

162.    Even if the circumstances of the demonstration had warranted effectuation of seizures by use of force, Fernandez's order and subsequent command actions authorized a quantum of force constituting excessive force, and were a proximate cause of the deprivation of plaintiffs' Fourth Amendment rights to be free from the use of unreasonably "excessive force" independent of the legality or illegality of the seizure.

163.    As a direct result of the Defendant's order, the plaintiffs suffered the aforementioned

*Jennings v. City of Miami*
Case No.

constitutional deprivations, permanent physical injuries, and other damages.

## COUNT FOURTEEN
### Supervisory Liability - Directing Unlawful Acts
### (42 USC § 1983 – Violation of First Amendment)
### Against CANNON

164.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

165.   Miami PD Captain Cannon was an integral part of the planning for the FTAA, including planning the security of the ministerial meetings, the planning of the demonstration sites and the police mobilization. **Captain Cannon was personally present** on Biscayne Blvd. during the afternoon of November 20th, when he observed several hundred persons gathered on the grass area north of the FTAA security perimeter and east of the amphitheater.

166.   After the line had been ordered to march northward by Miami PD Deputy Chief Fernandez, **in his capacity as official decision maker** for the use of weapons for the police skirmish line, **Captain Cannon** *personally gave the order  to begin discharging weapons* at the unarmed demonstrators, which decision deprived plaintiffs of their constitutional rights.

167.   At the precise time on November 20, 2003 that  plaintiffs were assaulted by the police line, Cannon was situated near Biscayne Blvd. and the grass field, just to the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and of the discharge of tear gas, bean bags and  pepper spray  into the gathering of unarmed

*Jennings v. City of Miami*
Case No.

demonstrators.

168.   Defendant Cannon's order to commence firing at unarmed demonstrators and his subsequent command orders were a proximate cause of the deprivation of plaintiffs' First Amendment rights of speech, assembly, and association.

169.   As a direct result of the Defendant's order, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

## COUNT FIFTEEN
### Supervisory Liability  -  Directing Unlawful Acts
### (42 USC § 1983  – Violation of Fourth  Amendment–Unreasonable Seizure)
### Against CANNON

170.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

171.   Miami PD Captain Cannon was an integral part of the planning for the FTAA, including planning the security of the ministerial meetings, the planning of the demonstration sites and the police mobilization.  **Captain Cannon was personally present** on Biscayne Blvd. during the afternoon of November 20th, when he observed several hundred persons gathered on the grass area north of the FTAA security perimeter and east of the amphitheater.

172.   After the line had been ordered to march northward by Miami PD Deputy Chief Fernandez, **in his capacity as official decision maker** for the use of weapons for the police

*Jennings v. City of Miami*
Case No.

skirmish line, **Captain Cannon** *personally gave the order to begin discharging weapons* at the unarmed demonstrators, which decision deprived plaintiffs of their constitutional rights.

173.   At the precise time on November 20, 2003 that  plaintiffs were assaulted by the police line, Cannon was situated near Biscayne Blvd. and the grass field, just to the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and of the discharge of tear gas,  pepper spray, bean bags, and other projectiles  into the gathering of unarmed demonstrators.   The discharge of projectiles constituted the use of deadly force.

174.   Defendant Cannon's order to commence firing at unarmed demonstrators and his subsequent command orders were a proximate cause of the deprivation of plaintiffs' Fourth Amendment right to be free from unreasonable seizure, while conducting themselves in a peaceful, lawful manner.

175.   As a direct result of the Defendant's order, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

**COUNT SIXTEEN**

**Supervisory Liability  -  Directing Unlawful Acts**
**(42 USC § 1983  – Violation of Fourth  Amendment–Excessive Force)**
**Against CANNON**

176.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

*Jennings v. City of Miami*
Case No.

177.   Miami PD Captain Cannon was an integral part of the planning for the FTAA, including planning the security of the ministerial meetings, the planning of the demonstration sites and the police mobilization. **Captain Cannon was personally present** on Biscayne Blvd. during the afternoon of November 20th, when he observed several hundred persons gathered on the grass area north of the FTAA security perimeter and east of the amphitheater.

178.   After the line had been ordered to march northward by Miami PD Deputy Chief Fernandez, **in his capacity as official decision maker** for the use of weapons for the police skirmish line, **Captain Cannon *personally gave the order  to begin discharging weapons*** at the unarmed demonstrators, which decision deprived plaintiffs of their constitutional rights.

179.   At the precise time on November 20, 2003 that  plaintiffs were assaulted by the police line, Cannon was situated near Biscayne Blvd. and the grass field, just to the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and of the discharge of tear gas,  pepper spray, bean bags, and other projectiles  into the gathering of unarmed demonstrators.   The discharge of projectiles constituted the use of deadly force.

180.   Even if the circumstances of the demonstration had warranted effectuation of seizures by use of force, Defendant Cannon's order to commence firing at unarmed demonstrators and his subsequent command orders authorized a quantum of force constituting excessive force, and were a proximate cause of the deprivation of plaintiffs' Fourth Amendment right to be free from the use of unreasonably "excessive force" independent of the legality or illegality of the seizure.

181.   As a direct result of the Defendant's order, the plaintiffs suffered the aforementioned

*Jennings v. City of Miami*
Case No.

constitutional deprivations, permanent physical injuries and other damages.

## COUNT SEVENTEEN
### Supervisory Liability--Directing Unlawful Acts
### (42 USC § 1983 – Violation of First Amendment)
### Against YERO, BROOKS, and SPECTOR

182.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

183.   Lt. Yero was an official decisionmaker for the City of Miami Beach PD's forces provided for the FTAA pursuant to the mutual aid agreement and other agreements, with respect to the decision to discharge shotgun-based projectiles, pepper spray and tear gas. Yero gave the order to shoot and spray unarmed demonstrators near Biscayne Boulevard  at approximately 3:30 p.m. on November 20, 2003.

184.   Capt. Brooks was an official decisionmaker as the commander of the BSO field force provided for the FTAA pursuant to the mutual aid agreement and other agreements, responsible for the movement of LEOs under his command and the discharge of weapons.

185.   Capt. Spector was an official decisionmaker as the commander of a 45-member Fort Lauderdale PD platoon, referred to as the BRAVO field force, which was provided for the FTAA on November 20, 2003, pursuant to the mutual aid agreement and other agreements, responsible for the movement of LEOs under his command and the discharge of weapons.

186.   On November 20, 2003, at the time that  plaintiffs were assaulted by the police line,

*Jennings v. City of Miami*
Case No.

on information and belief, Yero, Brooks, and Spector were on or directly behind the police skirmish line that was marching northward to herd demonstrators, and directed their platoons to follow the orders of Fernandez and Cannon to march northward and discharge weapons at the unarmed demonstrators, including the plaintiffs.

187.   The command orders of Yero, Brooks, and Spector proximately caused the deprivation of plaintiffs' First Amendment rights of speech, assembly, and association.

188.   As a direct result of the Defendants' conduct, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

## COUNT EIGHTEEN
### Supervisory Liability--Directing Unlawful Acts
### (42 USC § 1983 – Violation of Fourth Amendment–Unreasonable Seizure)
### Against YERO, BROOKS, and SPECTOR

189.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

190.   Lt. Yero was an official decisionmaker for the City of Miami Beach PD's forces provided for the FTAA pursuant to the mutual aid agreement and other agreements, with respect to the decision to discharge projectiles, pepper spray and tear gas.   Yero gave the order to shoot and spray unarmed demonstrators near Biscayne Boulevard at approximately 3:30 p.m. on November 20, 2003.

191.   Capt. Brooks was an official decisionmaker as the commander of the BSO field force

*Jennings v. City of Miami*
Case No.

provided for the FTAA pursuant to the mutual aid agreement and other agreements, responsible for the movement of LEOs under his command and the discharge of weapons.

192.   Capt. Spector was an official decisionmaker as the commander of a 45-member Fort Lauderdale PD platoon, referred to as the BRAVO field force, which was provided for the FTAA on November 20, 2003, pursuant to the mutual aid agreement and other agreements, responsible for the movement of LEOs under his command and the discharge of weapons.

193.   On November 20, 2003, at the time that  plaintiffs were assaulted by the police line, on information and belief, Yero, Brooks, and Spector were on or directly behind the police skirmish line that was marching northward to herd demonstrators, and directed their platoons to follow the orders of Fernandez and Cannon to march northward and discharge weapons at the unarmed demonstrators, including the plaintiffs.     The discharge of projectiles constituted the use of deadly force.

194.   The command orders of Yero, Brooks, and Spector proximately caused the deprivation of plaintiffs' Fourth Amendment right to be free from unreasonable seizure, while conducting themselves in a peaceful, lawful manner.

195.   As a direct result of the Defendants' conduct, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

**COUNT NINETEEN**
**Supervisory Liability--Directing Unlawful Acts**
**(42 USC § 1983  – Violation of Fourth  Amendment–Excessive Force)**
**Against YERO, BROOKS, and SPECTOR**

*Jennings v. City of Miami*
Case No.

196.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

197.   Lt. Yero was an official decisionmaker for the City of Miami Beach PD's forces provided for the FTAA pursuant to the mutual aid agreement and other agreements, with respect to the decision to discharge projectiles, pepper spray and tear gas.   Yero gave the order to shoot and spray unarmed demonstrators near Biscayne Boulevard at approximately 3:30 p.m. on November 20, 2003.

198.   Capt. Brooks was an official decisionmaker as the commander of the BSO field force provided for the FTAA pursuant to the mutual aid agreement and other agreements, responsible for the movement of LEOs under his command and the discharge of weapons.

199.   Capt. Spector was an official decisionmaker as the commander of a 45-member Fort Lauderdale PD platoon, referred to as the BRAVO field force, which was provided for the FTAA on November 20, 2003, pursuant to the mutual aid agreement and other agreements, responsible for the movement of LEOs under his command and the discharge of weapons.

200.   On November 20, 2003, at the time that plaintiffs were assaulted by the police line, on information and belief, Yero, Brooks, and Spector were on or directly behind the police skirmish line that was marching northward to herd demonstrators, and directed their platoons to follow the orders of Fernandez and Cannon to march northward and discharge weapons at the unarmed demonstrators, including the plaintiffs.    The discharge of projectiles constituted the use of deadly force.

*Jennings v. City of Miami*
Case No.

201.   Even if the circumstances of the demonstration had warranted effectuation of seizures by use of force, the command orders of Yero, Brooks, and Spector authorized a quantum of force constituting excessive force, and proximately caused the deprivation of plaintiffs' Fourth Amendment rights to be free from the use of unreasonably "excessive force" independent of the legality or illegality of the seizure.

202.   As a direct result of the Defendants' conduct, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

**COUNT TWENTY**

**Supervisory Liability-Failure to Intervene**

**(42 USC § 1983 – Violation of First Amendment)**

**Against TIMONEY and BURDEN**

203.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93 and 132-136, as if set forth at length herein.

204.   Chief TIMONEY was the official decisionmaker regarding the entire FTAA law enforcement operation, including the deployment of SWAT teams, field forces, bicycle response platoons, tanks, and helicopters involved in the deprivation of plaintiffs' constitutional rights.

205.   Chief Timoney and Major Adam Burden were together on the grass field just east of Biscayne Boulevard on November 20, 2003, at the precise time in the afternoon that plaintiffs were assaulted by the police line; at that moment, Chief Timoney and Major

*Jennings v. City of Miami*
Case No.

Burden were within less than 100 feet from the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and the discharge of tear gas, bean bags and pepper spray into the gathering of unarmed demonstrators.

206.   On information and belief, Chief Timoney and Major Burden failed to intervene and countermand the orders given by Deputy Chief Fernandez and Captain Cannon, thereby permitting the police line to continue marching northward while discharging hundreds of projectiles and tear gas and beating unarmed demonstrators.

207.   Chief Timoney's and Major Burden's failure to intervene and countermand the aforementioned orders was the proximate cause of the deprivation of the plaintiffs' First Amendment rights of speech, assembly, and association.

208.   As a direct result of the defendants' failure to countermand the aforementioned orders, the plaintiffs suffered the above-referenced constitutional deprivations, and permanent physical injuries.

## COUNT TWENTY-ONE
### Supervisory Liability-Failure to Intervene
### (42 USC § 1983 – Violation of Fourth Amendment–Unreasonable Seizure)
### Against TIMONEY and BURDEN

209.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93 and 138-142, as if set forth at length herein.

210.   Chief TIMONEY was the final policymaker and/or official decisionmaker regarding

*Jennings v. City of Miami*
Case No.

the entire FTAA law enforcement operation, including the deployment of SWAT teams, field forces, bicycle response platoons, tanks, and helicopters involved in the deprivation of plaintiffs' constitutional rights.

211.  Chief Timoney and Major Adam Burden were together on the grass field just east of Biscayne Boulevard on November 20, 2003, at the precise time in the afternoon that plaintiffs were assaulted by the police line; at that moment, Chief Timoney and Major Burden were within less than 100 feet from the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and the discharge of tear gas, pepper spray, bean bags, and other projectiles into the gathering of unarmed demonstrators.

212.  On information and belief, Chief Timoney and Major Burden failed to intervene and countermand the orders given by Deputy Chief Fernandez and Captain Cannon, thereby permitting the police line to continue marching northward while discharging hundreds of projectiles and chemical agents and beating unarmed demonstrators.    The discharge of projectiles constituted the use of deadly force.

213.  Chief Timoney's and Major Burden's failure to intervene and countermand the aforementioned orders was the proximate cause of the deprivation of the plaintiffs' Fourth Amendment rights to be free from unreasonable seizure, while conducting themselves in a peaceful, lawful manner.

214.  As a direct result of the defendants' failure to countermand  the aforementioned orders, the plaintiffs suffered the above-referenced constitutional deprivations, and permanent physical injuries.

68

*Jennings  v. City of Miami*
Case No.

## COUNT TWENTY-TWO
### Supervisory Liability-Failure to Intervene
### (42 USC § 1983 – Violation of Fourth Amendment–Excessive Force)
### Against TIMONEY and BURDEN

215.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93 and 144-148, as if set forth at length herein.

216.   Chief TIMONEY was the final policymaker and/or official decisionmaker regarding the entire FTAA law enforcement operation, including the deployment of SWAT teams, field forces, bicycle response platoons, tanks, and helicopters involved in the deprivation of plaintiffs' constitutional rights.

217.   Chief Timoney and Major Adam Burden were together on the grass field just east of Biscayne Boulevard on November 20, 2003, at the precise time in the afternoon that plaintiffs were assaulted by the police line; at that moment, Chief Timoney and Major Burden were within less than 100 feet from the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and the discharge of tear gas, pepper spray, bean bags, and other projectiles into the gathering of unarmed demonstrators.

218.   On information and belief, Chief Timoney and Major Burden failed to intervene and countermand the orders given by Deputy Chief Fernandez and Captain Cannon, thereby permitting the police line to continue marching northward while discharging hundreds of projectiles and chemical agents and beating unarmed demonstrators.   The discharge of projectiles constituted the use of deadly force.

*Jennings v. City of Miami*
Case No.

219.   Even if the circumstances of the demonstration had warranted effectuation of seizures by use of force, Chief Timoney's and Major Burden's failure to intervene and countermand the aforementioned orders authorized a quantum of force constituting excessive force, and was the proximate cause of the deprivation of the plaintiffs' Fourth Amendment rights to be free from the use of unreasonably "excessive force" independent of the legality or illegality of the seizure.

220.   As a direct result of the defendants' failure to countermand  the aforementioned orders, the plaintiffs suffered  the above-referenced constitutional deprivations, and permanent physical injuries.

**COUNT TWENTY-THREE**
**Supervisory Liability-Failure to Intervene**
**(42 USC § 1983 – Violation of First  Amendment)**
**Against FERNANDEZ and CANNON**

221.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, 150-153 and 165-169, as if set forth at length herein.

222.   Deputy Chief Fernandez was an official decision maker in his role as Incident Commander, and he made the decision to corral the demonstrators by herding them on November 20, 2003, by directing the police lines to march northward, which decision deprived the plaintiffs of their constitutional rights.

223.   Captain Cannon was an official decision maker and directed the police lines, which had been ordered to march northward by Fernandez, to begin discharging weapons at the

*Jennings v. City of Miami*
Case No.

unarmed demonstrators, which decision deprived plaintiffs of their constitutional rights.

224.   On November 20, 2003, at the time that plaintiffs were assaulted by the police line, Fernandez and Cannon were situated near Biscayne Blvd. and the grass field, just to the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and of the discharge of tear gas, bean bags and  pepper spray  into the gathering of unarmed demonstrators

Even with their unobstructed view of the injuries being visited upon dozens of unarmed persons directly in front of them without cause, Fernandez and Cannon failed to intervene, thereby permitting the police line to continue marching northward while discharging hundreds of projectiles and tear gas and beating unarmed demonstrators.

225.   The failure to intervene by Fernandez and Cannon was the proximate cause of the deprivation of plaintiffs' First Amendment rights of speech, assembly, and association.

226.   As a direct result of the Defendants' failure to intervene, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

## COUNT TWENTY-FOUR
### Supervisory Liability-Failure to Intervene
### (42 USC § 1983 – Violation of Fourth Amendment–Unreasonable Seizure)
### Against FERNANDEZ and CANNON

227.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of

71

*Jennings v. City of Miami*
Case No.

Paragraphs 1-93, 155-158 and 171-175, as if set forth at length herein.

228. Deputy Chief Fernandez was an official decision maker in his role as Incident Commander, and he made the decision to corral the demonstrators by herding them on November 20, 2003, by directing the police lines to march northward, which decision deprived the plaintiffs of their constitutional rights.

229. Captain Cannon was an official decision maker and directed the police lines, which had been ordered to march northward by Fernandez, to begin discharging weapons at the unarmed demonstrators, which decision deprived plaintiffs of their constitutional rights.

230. On November 20, 2003, at the time that plaintiffs were assaulted by the police line, Fernandez and Cannon were situated near Biscayne Blvd. and the grass field, just to the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and of the discharge of tear gas, pepper spray, bean bags, and other projectiles into the gathering of unarmed demonstrators. Even with their unobstructed view of the injuries being visited upon dozens of unarmed persons directly in front of them without cause, Fernandez and Cannon failed to intervene, thereby permitting the police line to continue marching northward while discharging hundreds of projectiles and chemical agents and beating unarmed demonstrators. The discharge of projectiles constituted the use of deadly force.

231. The failure to intervene by Fernandez and Cannon was the proximate cause of the deprivation of plaintiffs' Fourth Amendment right to be free from unreasonable seizure, while conducting themselves in a peaceful, lawful manner.

232. As a direct result of the Defendants' failure to intervene, the plaintiffs suffered the

*Jennings v. City of Miami*
Case No.

aforementioned constitutional deprivations, permanent physical injuries and other damages.

## COUNT TWENTY-FIVE
### Supervisory Liability-Failure to Intervene
### (42 USC § 1983 – Violation of Fourth Amendment–Excessive Force)
### Against FERNANDEZ and CANNON

233.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, 160-163 and 177-181, as if set forth at length herein.

234.   Deputy Chief Fernandez was an official decision maker in his role as Incident Commander, and he made the decision to corral the demonstrators by herding them on November 20, 2003, by directing the police lines to march northward, which decision deprived the plaintiffs of their constitutional rights.

235.   Captain Cannon was an official decision maker and directed the police lines, which had been ordered to march northward by Fernandez, to begin discharging weapons at the unarmed demonstrators, which decision deprived plaintiffs of their constitutional rights.

236.   On November 20, 2003, at the time that plaintiffs were assaulted by the police line, Fernandez and Cannon were situated near Biscayne Blvd. and the grass field, just to the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and of the discharge of tear gas, pepper spray, bean bags, and other projectiles into the gathering of unarmed demonstrators.   Even with their unobstructed view of the injuries being visited upon dozens of unarmed persons directly in front of them without cause, Fernandez and Cannon failed to intervene, thereby permitting the police line to continue marching

*Jennings v. City of Miami*
Case No.

northward while discharging hundreds of projectiles and chemical agents and beating unarmed demonstrators. The discharge of projectiles constituted the use of deadly force.

237.   Even if the circumstances of the demonstration had warranted effectuation of seizures by use of force, the failure to intervene by Fernandez and Cannon authorized a quantum of force constituting excessive force, and was the proximate cause of the deprivation of plaintiffs' Fourth Amendment right to be free from the use of unreasonably "excessive force" independent of the legality or illegality of the seizure.

238.   As a direct result of the Defendants' failure to intervene, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

**COUNT TWENTY-SIX**
**Supervisory Liability–Failure to Intervene**
**(42 USC § 1983 – Violation of First Amendment)**
**Against YERO, BROOKS, and SPECTOR**

239.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93 and 183-188, as if set forth at length herein.

240.   Lt. Yero was an official decisionmaker as noted in Count Seventeen.   Yero gave the order to spray unarmed demonstrators on Biscayne Boulevard with tear gas at approximately 3:30 p.m. on November 20, 2003.

241.   Capt. Brooks was an official decisionmaker as noted in Count Seventeen.

*Jennings v. City of Miami*
Case No.

242.    Capt. Spector was an official decisionmaker as noted in Count Seventeen.

243.    On November 20, 2003, at the time that  plaintiffs were assaulted by the police line, on information and belief, Yero, Brooks, and Spector were on or directly behind the police skirmish line that was marching northward to herd demonstrators,  and they failed to intervene after personally viewing the severe injuries caused as the police line continued marching northward while discharging hundreds of projectiles and tear gas and beating unarmed demonstrators.

244.    The failure of Yero, Brooks, and Spector to intervene was the proximate cause of the deprivation of plaintiffs' First Amendment rights of speech, assembly, and association.

245.    As a direct result of the Defendants' failure to intervene, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

## COUNT TWENTY-SEVEN
### Supervisory Liability–Failure to Intervene
### (42 USC § 1983  – Violation of Fourth Amendment–Unreasonable Seizure)
### Against YERO, BROOKS, and SPECTOR

246.    Plaintiffs reallege and incorporate each jurisdictional and factual allegation of

*Jennings v. City of Miami*
Case No.

Paragraphs 1-93 and 190-195, as if set forth at length herein.

247.   Lt. Yero was an official decisionmaker as noted in Count Eighteen.   Yero gave the order to spray unarmed demonstrators on Biscayne Boulevard with tear gas at approximately 3:30 p.m. on November 20, 2003.

248.   Capt. Brooks was an official decisionmaker as noted in Count Eighteen.

249.   Capt. Spector was an official decisionmaker as noted in Count Eighteen.

250.   On November 20, 2003, at the time that plaintiffs were assaulted by the police line, on information and belief, Yero, Brooks, and Spector were on or directly behind the police skirmish line that was marching northward to herd demonstrators,  and they failed to intervene after personally viewing the severe injuries caused as the police line continued marching northward while discharging hundreds of projectiles and chemical agents  and beating unarmed demonstrators.

251.   The failure of Yero, Brooks, and Spector to intervene was the proximate cause of the deprivation of plaintiffs' Fourth Amendment right to be free from unreasonable seizure, while conducting themselves in a peaceful, lawful manner.

252.   As a direct result of the Defendants' failure to intervene, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

## COUNT TWENTY-EIGHT

*Jennings v. City of Miami*
Case No.

### Supervisory Liability–Failure to Intervene
### (42 USC § 1983 – Violation of Fourth Amendment–Excessive Force)
### Against YERO, BROOKS, and SPECTOR

253.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93 and 197-202, as if set forth at length herein.

254.   Lt. Yero was an official decisionmaker as noted in Count Nineteen.   Yero gave the order to spray unarmed demonstrators on Biscayne Boulevard with tear gas at approximately 3:30 p.m. on November 20, 2003.

255.   Capt. Brooks was an official decisionmaker as noted in Count Nineteen.

256.   Capt. Spector was an official decisionmaker as noted in Count Nineteen.

257.   On November 20, 2003, at the time that plaintiffs were assaulted by the police line, on information and belief, Yero, Brooks, and Spector were on or directly behind the police skirmish line that was marching northward to herd demonstrators, and they failed to intervene after personally viewing the severe injuries caused as the police line continued marching northward while discharging hundreds of projectiles and chemical agents and beating unarmed demonstrators.

258.   Even if the circumstances of the demonstration had warranted effectuation of seizures by use of force, the failure of Yero, Brooks, and Spector to intervene authorized a quantum of force constituting excessive force, and was the proximate cause of the deprivation of plaintiffs' Fourth Amendment right to be free from the use of unreasonably

*Jennings v. City of Miami*
Case No.

"excessive force" independent of the legality or illegality of the seizure.

259.   As a direct result of the Defendants' failure to intervene, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

## COUNT TWENTY-NINE
### Conspiracy to Violate Civil Rights
### (42 USC § 1983 – Violation of First Amendment)
### Against CITY OF MIAMI, CITY OF MIAMI BEACH, CITY OF FORT LAUDERDALE, and BSO

260.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

261.   Through the months of planning leading up to the FTAA, including the mutual aid agreements and the Joint Law Enforcement Command, defendants CITY OF MIAMI, CITY OF MIAMI BEACH, CITY OF FORT LAUDERDALE, and BSO had an unwritten agreement to suppress dissent at the FTAA through a show of overwhelming force, thereby violating the First Amendment rights of speech, assembly, and association of Plaintiffs and other demonstrators.

262.   The agreement among these defendants was implemented on November 20, 2003, by the formation of police lines that herded demonstrators and subjected demonstrators to a barrage of tear gas, rubber bullets, beanbags, thereby disrupting the lawful First Amendment speech and assembly of plaintiffs and others.

*Jennings v. City of Miami*
Case No.

263.   This conspiracy was the proximate cause of the deprivation of plaintiffs' First Amendment rights of speech, assembly, and association.

264.   As a direct result of the Defendants' conspiracy, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

**COUNT THIRTY**

**Conspiracy to Violate Civil Rights**

**(42 USC § 1983 – Violation of Fourth Amendment–Unreasonable Seizure)**

**Against CITY OF MIAMI, CITY OF MIAMI BEACH, CITY OF FORT LAUDERDALE, and BSO**

265.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

266.   Through the months of planning leading up to the FTAA, including the mutual aid agreements and the Joint Law Enforcement Command, defendants CITY OF MIAMI, CITY OF MIAMI BEACH, CITY OF FORT LAUDERDALE, and BSO had an unwritten agreement to suppress dissent at the FTAA through a show of overwhelming force, thereby violating Plaintiffs' and other demonstrators' Fourth Amendment rights to be free of unreasonable seizures.

267.   The agreement among these defendants was implemented on November 20, 2003, by the formation of police lines that herded demonstrators and subjected demonstrators to a barrage of tear gas, rubber bullets, beanbags, thereby subjecting plaintiffs and others to

*Jennings v. City of Miami*
Case No.

unreasonable seizure by excessive force and herding in violation of the Fourth Amendment.

268.   This conspiracy was the proximate cause of the deprivation of plaintiffs' Fourth Amendment right to be free from unreasonable seizure, while conducting themselves in a peaceful, lawful manner.

269.   As a direct result of the Defendants' conspiracy, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

## COUNT THIRTY-ONE
### Conspiracy to Violate Civil Rights
### (42 USC § 1983 – Violation of Fourth Amendment–Excessive Force)
### Against CITY OF MIAMI, CITY OF MIAMI BEACH, CITY OF FORT LAUDERDALE, and BSO

270.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

271.   Through the months of planning leading up to the FTAA, including the mutual aid agreements and the Joint Law Enforcement Command, defendants CITY OF MIAMI, CITY OF MIAMI BEACH, CITY OF FORT LAUDERDALE, and BSO had an unwritten agreement to suppress dissent at the FTAA through a show of overwhelming force, thereby violating Plaintiffs' and other demonstrators' Fourth Amendment rights to be free of unreasonable seizures.

272.   The agreement among these defendants was implemented on November 20, 2003, by

*Jennings v. City of Miami*
Case No.

the formation of police lines that herded demonstrators and subjected demonstrators to a barrage of tear gas, rubber bullets, beanbags, thereby subjecting plaintiffs and others to unreasonable seizure by excessive force and herding in violation of the Fourth Amendment.

273.   This conspiracy was the proximate cause of the deprivation of plaintiffs' Fourth Amendment right to be free from the use of unreasonably "excessive force" independent of the legality or illegality of the seizure.

274.   As a direct result of the Defendants' conspiracy, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

## COUNT THIRTY-TWO
### Supervisory Liability – Directing Unlawful Acts
### (42 USC § 1983 – Violation of Fourteenth Amendment–Substantive Due Process–Excessive Force)
### Against TIMONEY, FERNANDEZ, CANNON, BURDEN, YERO, BROOKS, and SPECTOR

275.   Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

276.   On November 20, 2003, in the late afternoon, on Biscayne Blvd. in downtown Miami, the supervisory Defendants directed, authorized, condoned, and/or ratified the encirclement, herding, and indiscriminate and overwhelming show of force utilizing projectile weapons and chemical agents, all directed against Plaintiffs and others similarly situated, when Plaintiffs and others present were engaged in peaceful, lawful activities, including but not limited to protest.

277.   The supervisory Defendants were present on Biscayne Blvd., and positioned to be

*Jennings v. City of Miami*
Case No.

able to observe the numerous injuries inflicted on Plaintiffs and others similarly situated as the result of the orders given to the multi-agency field forces to march north on Biscayne Blvd. and to discharge weapons.

278.    The actions of the supervisory Defendants constitute the most egregious official conduct, unjustifiable by any governmental interest, such that the Defendants' conduct shocks the conscience.    The use of force was not needed, the injury inflicted on Plaintiffs and others similarly situated was substantial, and the force was applied maliciously for the purpose of causing harm.

279.    As a direct and proximate result of the Defendants' conduct, the plaintiffs suffered the aforementioned constitutional deprivations, permanent physical injuries and other damages.

## COUNT THIRTY-THREE
### State Law – Battery
### Against CITY OF MIAMI, CITY OF MIAMI BEACH, CITY OF FORT LAUDERDALE, and BSO

280.    Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 1-93, as if set forth at length herein.

281.    As specifically delineated in Paragraphs 8 through 11, and Paragraphs 121 and 122, the governmental Defendants entered into an agreement to act in concert during FTAA-related events in Miami.    Field forces, including SWAT teams, from the CITY OF MIAMI, CITY OF MIAMI BEACH, CITY OF FORT LAUDERDALE, and BSO comprised the

*Jennings v. City of Miami*
Case No.

police lines that on November 20, 2003, at approximately 3:30 p.m. onwards, herded demonstrators and discharged tear gas and projectile weapons at demonstrators. The Plaintiffs were among those struck by projectiles, pepper spray and tear gas and severely injured.

282. The use of projectile weaponry and various chemical weapons constituted an intentional harmful or offensive contact with Plaintiffs, committed by Defendants' field force personnel within the course and scope of their employment with the respective Defendants.

283. As a direct result of being hit with projectiles fired by Defendants' employees, Plaintiffs suffered severe and permanent injuries including, but not limited to, economic losses, medical expenses, physical and emotional pain and suffering, and mental anguish.

**COUNT THIRTY-FOUR**

**State Law – Negligence**

**Against CITY OF MIAMI, CITY OF MIAMI BEACH, CITY OF FORT LAUDERDALE, and BSO**

284. Plaintiffs reallege and incorporate each jurisdictional and factual allegation of Paragraphs 2-46, as if set forth at length herein.

285. Field forces from the CITY OF MIAMI, CITY OF MIAMI BEACH, CITY OF FORT LAUDERDALE, and BSO comprised the police lines that on November 20, 2003, at approximately 3:30 p.m. onwards, herded demonstrators and discharged chemical weapons and projectiles at demonstrators, including Plaintiffs, who were struck and severely injured

*Jennings v. City of Miami*
Case No.

by those weapons.


286.   Defendants owed a duty to the Plaintiffs to exercise reasonable care by providing repeated audible warnings to disperse and allowing a reasonable time to disperse before discharging any weapons that the Defendants knew had a high probability of causing considerable physical harm.  Defendants owed a further duty to the Plaintiffs to exercise reasonable care in ensuring that only specific persons (if any) who had engaged in illegal conduct were subject to the use of force by projectiles and chemical weapons.


287.   Defendants breached these duties of care by firing projectiles and chemical weapons at Plaintiffs without providing  warnings or adequate time for Plaintiffs and other demonstrators to disperse, and by failing to provide safeguards to prevent Plaintiffs and other innocent persons from being harmed.


288.   As a direct and proximate result of the negligent  conduct of Defendants, the Plaintiffs suffered severe and permanent injuries including, but not limited to, economic losses, medical expenses, physical and emotional pain and suffering, and mental anguish.


## PRAYERS FOR RELIEF

**Counts 1 through 7, 29-31:**

WHEREFORE, Plaintiffs seek judgment against Defendant(s) for the following relief:

a.   Compensatory Damages;

b.   Costs of Suit;

c.   Attorneys' Fees pursuant to 42 USC § 1988;

*Jennings  v. City of Miami*
**Case No.**

d.      Further Relief as this court deems just and proper.


**Counts 8 through 28, 32:**

WHEREFORE, Plaintiffs seek judgment against Defendant(s) for the following relief:

a.      Compensatory Damages;

b.      Punitive Damages;

c.      Costs of Suit;

d.      Attorneys' Fees pursuant to 42 USC § 1988;

e.      Further Relief as this court deems just and proper.


**Counts 33 and 34:**

WHEREFORE, Plaintiffs seek judgment against Defendant(s) for the following relief:

a.      Compensatory Damages;

b.      Further Relief as this court deems just and proper.

*Jennings v. City of Miami*
Case No.

| | |
|---|---|
| **BARRY M. SILVER, P.A.**<br>1200 S. Rogers Circle, Suite 8<br>Boca Raton, Florida   33487<br>(561) 483-6900<br>barryboca@aol.com<br><br><br>**Barry M. Silver**<br>Fla. Bar No. 382108 | **LAW OFFICES OF**<br>**MARA SHLACKMAN, P.L.**<br>757 Southeast 17th Street, PMB 309<br>Fort Lauderdale, Florida   33316<br>(954) 523-1131<br>(954) 206-0593<br>mara@shlackmanlaw.com<br><br><br>**Mara Shlackman**<br>Fla. Bar No. 988618 |

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

Cara Jennings, et al. (See attached caption)

### DEFENDANTS

See attached caption

**07-23008**

**CIV-COOKE**

**(b)** County of Residence of First Listed Plaintiff   Palm Beach
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Miami-Dade
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Barry M. Silver, BARRY M. SILVER, P.A., 1200 S. Rogers Circle, Suite A, Boca Raton, FL 33487
Tel: 561.483.6900

Attorneys (If Known)

**MAGISTRATE JUDGE BROWN**

**(d)** Check County Where Action Arose:  ☑ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☑ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

*(handwritten)* Dade-07-23008-CV-Cooke-Brown

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☑ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

JUDGE  Judge C. Altonaga

DOCKET NUMBER  06-CV-21182

a) Re-filed Case ☐ YES ☑ NO    b) Related Cases ☑ YES ☐ NO

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

42 U.S.C. 1983, First, Fourth and Fourteenth Amendment; plaintiffs seized and subjected to excessive force

LENGTH OF TRIAL via  4-5  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☑ Yes  ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD   *(signature)*

DATE   11/19/07

FOR OFFICE USE ONLY

AMOUNT  $350.00   RECEIPT #  970172

11/19/07